**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 29 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MICHAEL AARON WILSON,

Defendant-Appellant.

No. 98-1323

**APPEAL FROM UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 97-CR-313-Z)**

Raymond P. Moore, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the brief), Denver, Colorado, for the appellant.

Kathleen M. Tafoya, Assistant United States Attorney (Linda A. McMahan, United States Attorney, with her on the brief), Denver, Colorado, for the appellee.

Before **PORFILIO**, **HENRY,** and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendant Michael Aaron Wilson appeals his conviction for possession of three or more matters containing visual depictions of minors engaged in sexually explicit conduct which were produced using materials shipped or transported in interstate commerce, in violation of 18 U.S.C. § 2252(a)(4)(B) (1996). We conclude the evidence presented at trial was insufficient to satisfy the jurisdictional element of the charged crime, and reverse defendant's conviction and remand with directions to enter a judgment of acquittal.

I.

United States Customs Service agents arrested Brian Gillingham in Dayton, Ohio, for possession of computerized child pornography. Gillingham cooperated with agents and gave them information regarding Randy Taylor of Denver, Colorado, with whom Gillingham had exchanged child pornography. Based upon information provided by Gillingham and materials found in his apartment, agents determined Randy Taylor was an alias used by defendant. Using an undercover persona, special agent Don Daufenbach sent two letters to defendant alleging Daufenbach was a collector of sadomasochistic child pornography involving boys. Daufenbach received two letters from defendant in which he expressed an interest in the same type of child pornography. In one of the letters, defendant indicated he had a wide variety of computerized images he was willing to trade and he included a printout of graphics files on his computer. After they exchanged

letters, Daufenbach contacted defendant through an Internet "chat room," where defendant again expressed an interest in sadomasochistic child pornography involving boys. Ultimately, agents obtained and executed a search warrant for defendant's residence. Defendant cooperated in the search by directing agents to areas of his computer hard drive, as well as computer diskettes, containing child pornography.

For reasons unclear from the record, defendant was initially indicted in the District of Utah on charges of violating 18 U.S.C. § 2252(a)(1) (sexual exploitation of a minor). These proceedings (Case No. 97-CR-505) were subsequently transferred to the District of Colorado where, upon the government's motion, they were dismissed without prejudice. Defendant was reindicted in the District of Colorado (Case No. 97-CR-313Z), and three superseding indictments were subsequently filed against him (one of which was filed by the government in the original dismissed case, i.e., Case No. 97-CR-505). The final indictment, a stipulated amended superseding indictment, charged defendant with a single count of possessing three or more matters (i.e., one computer hard drive and ten computer diskettes) containing visual depictions (i.e., graphics files) of minors engaging in sexually explicit conduct which were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce, in violation of 18 U.S.C. § 2252(a)(4)(B) (1996). A jury convicted defendant for

possession of the diskettes, but not for possession of the hard drive, and he was sentenced to a term of imprisonment of thirty months.

## II.

Defendant contends the evidence presented at trial was insufficient to establish the jurisdictional element of the charged crime, i.e., that the visual depictions were produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce. Although defendant attempts to couch this as a single issue, we conclude he has raised two related issues: (1) proper interpretation of the term "materials," as used in § 2252(a)(4)(B); and (2) whether the evidence presented at trial was sufficient to establish the requisite jurisdictional nexus.

### Interpretation of § 2252(a)(4)(B)

Defendant was charged with violating 18 U.S.C. § 2252(a)(4)(B) (1996), which provided that any person who

> knowingly possesses 3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction . . . which was produced using materials which have been mailed or . . . shipped or transported [in interstate or foreign commerce], by any means including by computer, if--
>     (i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>     (ii) such visual depiction is of such conduct;
> shall be punished as provided in subsection (b) of this section.

Defendant contends the term "materials," which is used in but not defined by the

statute, refers to the "ingredients of an object--here, the ingredients or components of a visual depiction." Appellant's Br. at 18. According to defendant, this definition "precludes any contention that 'materials' includes within its definitional scope tools or equipment or storage items (such as computers or floppy disks) used to hold, mold, or manipulate 'materials' into a visual depiction." Id.

We review the interpretation of a federal criminal statute de novo. United States v. Martin, 163 F.3d 1212, 1214 (10th Cir. 1998), cert. denied, 1999 WL 231032 (1999). In doing so, we begin, as we must, "with the language of the statute." Bailey v. United States, 516 U.S. 137, 144 (1995). The word "materials," as used in the statute at issue here, "must be given its 'ordinary or natural' meaning." Id. at 145. The term "material" is defined in Webster's as "of, relating to, or consisting of matter." Webster's Third New Int'l Dictionary 1392 (1993). In turn, the term "matter" is defined in Webster's as "material substance of a particular kind or for a particular purpose." Id. at 1394.

Although defendant's argument is not entirely without merit when the term "materials" is viewed in isolation, we are obligated to "consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme." Bailey, 516 U.S. at 145. The statute at issue here refers to "any visual depiction . . . which was produced using materials which have" traveled in interstate or

foreign commerce.  In other words, the statute clearly refers to "materials" used to produce a visual depiction.  Necessarily, we believe, this encompasses not only tangible matters that go into a visual depiction (i.e., that become an "ingredient" of the visual depiction), but also tangible matters that are used to give being, form or shape to, but that do not necessarily become a part or "ingredient" of, the visual depiction. [1]

In our view, defendant's proposed construction of the term "materials" effectively ignores the context in which the word appears in the statute, and thereby unduly narrows the reach of the statute.  Under defendant's construction, for example, a person in possession of a computer graphics file would be in violation of the statute only if the bits of information making up the file (i.e., the 1's and 0's) had at some point traveled in interstate or foreign commerce.  Thus, under defendant's interpretation, only graphics files copied from a computer located in another state or country, via the Internet or a bulletin board service

---

[1] Although defendant has focused solely on the meaning of the term "materials," we believe the meaning of the term "produced" is also important to resolution of this case.  The term "producing" is defined by statute to "mean[] producing, directing, manufacturing, issuing, publishing, or advertising."  18 U.S.C. § 2256(3).  Obviously, this definition, standing alone, is not particularly enlightening.  For further assistance, we turn to Webster's, which defines "produce" as "to give being, form, or shape to," "to bring forth a product or production: bear, make, or yield that which is according to nature or intention: grow, make, or furnish economically valuable products."  Webster's Third Int'l Dictionary 1810 (1993).

-6-

(BBS), would satisfy the jurisdictional nexus.

The broader definition we adopt today comports with that implicitly adopted by the First and Eighth Circuits. In United States v. Bausch, 140 F.3d 739 (8th Cir. 1998), cert. denied, 119 S. Ct. 806 (1999), defendant was convicted of violating § 2252(a)(4)(B) based upon his possession of photographs he had personally taken of two girls, ages fifteen and sixteen, in sexually suggestive poses. Although the photographs themselves had never traveled in interstate commerce, the jurisdictional nexus was satisfied because the jury found defendant took the photographs using a Japanese camera that had been transported in interstate or foreign commerce. Thus, the "materials" used to produce the photographs were not confined to the "ingredients" of the photographs themselves, but instead encompassed objects, including the camera, that were determined to give form or shape to the photographs. See United States v. Robinson, 137 F.3d 652, 653-54 (1st Cir. 1998) (use of camera and instant film made in another state satisfied jurisdictional nexus).

**Sufficiency of Evidence**

Having defined the term "materials," we next determine whether, applying this definition, the evidence presented at trial was sufficient to support defendant's conviction. In other words, we must determine whether the evidence presented at trial was sufficient to demonstrate the jurisdictional nexus for which

defendant was indicted, i.e., that the visual depictions [2] contained on the diskettes were produced using materials that traveled in interstate or foreign commerce.

Sufficiency of the evidence is a question of law reviewed de novo. United States v. Carter, 130 F.3d 1432, 1439 (10th Cir. 1997), cert. denied, 118 S. Ct. 1856 (1998). We will not reverse a conviction based upon insufficient evidence unless no rational trier of fact could have reached the disputed verdict. Id.; see Jackson v. Virginia, 443 U.S. 307, 319 (1979). In reviewing the record, we view the evidence and the reasonable inferences to be drawn therefrom in a light most favorable to the government, without weighing the evidence or considering the credibility of witnesses. Id.; United States v. Haslip, 160 F.3d 649, 652-53 (10th

---

[2] At the time of indictment and trial, "visual depictions" were defined under the statute, and in the court's instructions, as "any form of image or picture, including undeveloped film and videotape." Supp. Vol. 1, Doc. 51, Instruction 17. The statute has since been amended and "visual depiction" is now defined as "includ[ing] undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image." 18 U.S.C. § 2256(5). Under both definitions, the term "includes potential images as well as actual images, that is to say, images that have already been produced, yet require additional processing to render them viewable." United States v. Whiting, 165 F.3d 631, 633 (8th Cir. 1999).

> In this regard, an image stored as data which can be read by a computer is directly analogous to an image on video tape. They are both images stored as magnetic signals that require processing by the use of a machine in order to view them. The fact that they cannot be viewed as pornographic images until processed through the appropriate equipment does not place them outside the definition of "visual depiction" for purposes of the statute.

Id.

Cir. 1998), cert. denied , 119 S. Ct. 1346 (1999). The evidence necessary to support a verdict "need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." United States v. Parrish , 925 F.2d 1293, 1297 (10th Cir. 1991) (citations omitted). Instead, the evidence only has to "reasonably support the jury's finding of guilt beyond a reasonable doubt." Id. If, upon review of the evidence, we conclude the evidence presented was insufficient to sustain a conviction, retrial is barred. See Burks v. United States , 437 U.S. 1, 18 (1978); United States v. Dalton , 990 F.2d 1166, 1168 (10th Cir. 1993). A reversal for evidentiary insufficiency is tantamount to a declaration that the prosecution, given its single opportunity to muster its evidence, failed to prove its case beyond a reasonable doubt. Burks , 437 U.S. at 11-12.

Before reviewing the evidence presented at trial, we note the prosecution's strategy at trial for proving the jurisdictional element was extremely vague. Giving the prosecution the benefit of the doubt, it appears its primary theory was that the diskettes seized from defendant constituted both "matters" containing the visual depictions *and* "materials" used to produce the visual depictions. This theory, however, was not always clearly conveyed at trial. For example, during trial, the prosecution argued to the district court that it was the "matter" rather than the "materials" that needed to have traveled in interstate commerce. Supp.

Vol. 8 at 437, 439, and 440. During closing arguments, the prosecution seemed to return to its original theory when it argued to the jury that it needed to decide "what is the material that produced these pictures." Id. at 490. Again, however, the prosecution deviated from this theory by arguing to the jury:

> The information, the little Xs and Os, 1's and 0's, electrical impulses, were sitting on the hard drive, sitting on the disk, waiting to be used. But they're not produced into a picture until they're called forth. They're called forth from the disk, and they're called forth on the computer. And that's what we're talking about.

Id. at 490-91. By way of this latter argument, the prosecution seemed to be arguing it was the act of calling images up on the computer monitor that constituted "production" of a visual depiction.

Having outlined the prosecution's ever-shifting theories, we focus first on the theory that the diskettes were "materials" that traveled in interstate commerce and were used to produce the visual depictions at issue (i.e., the graphics files). Although the evidence was uncontroverted that the diskettes at issue traveled in interstate commerce, see Supp. Vol. 6 at 63 (no computer diskettes were manufactured in the state of Colorado), there was an alarming lack of proof that the diskettes were used to actually produce the graphics files. The government's main expert witness, Charles Davis, a criminal investigator with the Colorado Bureau of Investigation specializing in computer crime and high technology, testified that images/pictures can be stored in one of several computerized formats

(e.g., GIF, JPG, BIC), all of which are composed of bits of data (1's and 0's). Supp. Vol. 7 at 263-64. More specifically, Davis testified the bits of data are organized in sets of eight or twenty-four, with each set defining a specific pixel and the total number of pixels representing the entire image. Id. at 318-19. The government's other expert witness, Daufenbach, a special agent with the U.S. Customs Service, testified similarly that a computer graphics file is comprised of a series of charged and uncharged bits. Supp. Vol. 6 at 178-79. Neither witness, however, specifically explained how a computer graphics file is created. [3] Thus, although their testimony firmly established that computer graphics files can be stored or contained on computer diskettes, their testimony did not support the conclusion that computer diskettes are used to actually produce graphics files. To the contrary, their testimony left unanswered the question of whether a computer

---

[3] During direct examination, the prosecution asked Davis to explain why a computer graphics file was considered a "picture" or visual depiction, even though it was a series of 1's and 0's unviewable (without extra measures) to the naked eye. In particular, the prosecution asked Davis to "compare [a graphics file] to a [roll] of film." Supp. App. 7 at 306. Davis testified that the bits of data in a computer graphics file "are the same thing as the [dye] or the photosensitive chemicals on . . . film," and that "the little plastic inside a floppy disk [i.e., the piece of Mylar]" was like "the film itself." Id. at 306-07. Davis also analogized a graphics file on a diskette to an image on a videocassette. To the extent the government intended to rely on this testimony to explain how a graphics file was created, we reject it as insufficient. Although the average juror undoubtedly has some familiarity with film and videocassettes, we are not convinced he or she is sufficiently knowledgeable in how visual images are created on those types of media to make the necessary inferential leap and determine how a computer graphics file is created.

graphics file is produced or created prior to being recorded on a particular storage media, or whether, instead, it only comes into being at or after the point it is recorded on the storage media. Although we have no doubt this question has an answer (and thus do not foreclose the possibility that a diskette is a "material" used to produce a graphics file contained thereon), we conclude the evidence produced by the government in this case was insufficient to allow a reasonable juror to answer the question. Thus, we must determine whether the evidence presented at trial was sufficient to support the jury's verdict under any other theory.

As previously noted, the prosecution offered an alternate theory during closing arguments that the act of converting a computer graphics file stored on a diskette into a visual image on a computer monitor could constitute "production" of a visual depiction for purposes of the statute. Without foreclosing application of this theory under different circumstances, we find it of no value here. As previously noted, the stipulated amended superseding indictment narrowly charged defendant with violating § 2252(a)(4)(B) by possessing three or more computer diskettes that contained visual depictions, i.e., computer graphics files. Under § 2252(a)(4)(B), a computer graphics file is considered a "visual depiction" as it resides on a computer diskette in binary form; no act of viewing the file with software and a monitor is necessary. See Whiting, 165 F.3d at 633.

-12-

Thus, the focal point of the statute's jurisdictional element, as applied to the circumstances of this case, is whether the graphics files were produced using materials that traveled in interstate commerce. In other words, in determining whether the jurisdictional element is satisfied, the statute requires us to focus on the graphics files as they reside or are contained on the diskettes, and to determine what materials went into producing those files. It is irrelevant that defendant may have actually viewed the graphics files, using a computer, viewing software, and a monitor, because such viewing did not result in production of the graphics files; instead, such production necessarily had to have occurred either at or prior to the time the graphics files were recorded on the diskettes.

We also find untenable the prosecution's theory that only the "matter" must have traveled in interstate commerce. In our view, the language of § 2252(a)(4)(B) makes it abundantly clear that either the visual depictions (in this case the graphics files) or the materials used to produce the visual depictions must have traveled in interstate commerce. If Congress had wanted the focus of the jurisdictional element to be on the "matters" containing the visual depictions, it would have said so.

Two other possible theories remain, neither of which was specifically forwarded by the prosecution. At trial, Daufenbach testified that some of the images at issue originated from a BBS in California. In light of this testimony,

-13-

we believe it would perhaps have been reasonable for the jury to infer defendant

used his computer and modem to download those images, via telephone line,

directly from the BBS onto a diskette (in the form of graphics files). [4] The

problem, however, is that only one of the diskettes seized by authorities contained

images originating from the BBS. Because defendant was charged with

possessing three or more diskettes containing visual depictions, the fact that the

jurisdictional element was satisfied with respect to one diskette was not sufficient

to support defendant's conviction.

Daufenbach also testified that some of the images at issue originated from

German magazines. He offered no explanation, however, as to how those

particular images found their way to the diskettes in defendant's possession. Nor

did the prosecution otherwise attempt to outline the possible methods by which

defendant could have obtained the files through interstate commerce (e.g.,

---

[4] Although there was no direct evidence that defendant downloaded these images from the BBS, the evidence demonstrated (1) defendant was interested in the specific type of child pornography portrayed in those visual depictions; (2) he was computer literate; (3) he regularly used the computer to view such depictions and to communicate with other persons regarding his sexual interests; and (4) many of the pictures found on the diskettes were directly traceable to the BBS in that they specifically contained the BBS's name. Taken together, a jury could rationally have concluded defendant, while residing in Colorado, used his computer and downloaded those images from the BBS to diskette (rather than receiving the diskettes from someone else who had downloaded them). Under this theory, some of the "materials" used to produce the visual depictions found on the diskettes, in particular the bits of data, necessarily would have traveled in interstate commerce from California to Colorado via telephone line.

obtaining copies of the German magazines and scanning the images into his computer; downloading copies of the images from an out-of-state computer via the Internet or a BBS, etc.).  We therefore reject the possibility that Daufenbach's testimony regarding the origination of the images, standing alone, was sufficient to satisfy the jurisdictional element.     [5]

Having carefully examined the trial record and having considered and rejected all possible avenues for proving the jurisdictional element, we are forced to conclude the evidence was insufficient to support defendant's conviction.     [6]

Defendant's conviction is REVERSED and this case is REMANDED to the district court for entry of a judgment of acquittal.

---

[5] We offer the following example to demonstrate why Daufenbach's testimony could not, by itself, satisfy the jurisdictional element.  Imagine a person possesses a magazine and makes a color photocopy (copy #1) of one of the images contained therein.  Further imagine such person uses copy #1 to make a second color photocopy (copy #2).  Although the magazine would be a "material" used to produce copy #1, it would not be a "material" used to produce copy #2.  Thus, the fact that some of the images possessed by defendant originated at some point in German magazines does not demonstrate, without more, that the German magazines were actually "materials" used to produce the images possessed by defendant.

[6] Because we conclude the evidence was insufficient to support the conviction, it is unnecessary to address the remaining issue asserted on appeal.