**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 4 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

QUINCY LAMONT VANHOOK,

    Defendant - Appellant.

No. 04-2000
(D. New Mexico)
(D.Ct. No. CR-03-420 MV)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **McCONNELL**, Circuit Judge.

---

Defendant Quincy Vanhook was convicted by a jury of one count of conspiracy to possess with intent to distribute five grams and more of crack cocaine,[1] three counts of possession with intent to distribute less than five grams

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] Although the penalty statute applicable to Vanhook's conspiracy conviction states "five grams *or* more" of crack cocaine, *see* 21 U.S.C. § 841(b)(1)(B) (emphasis added), his indictment specifically stated "five grams *and* more." (R. Vol. II at 4; Vol. VI at 236) (emphasis added). Throughout this decision, we will remain consistent with the

of crack cocaine and one count of being a felon in possession of a firearm.  He challenges his conspiracy and felon in possession convictions based on insufficiency of the evidence.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

On September 3, 2002, Nick Jimenez, an undercover narcotics officer with the New Mexico State Police, went to Soleil Sligh's home in Hobbs, New Mexico, to purchase crack cocaine.[2]  Sligh lived with her boyfriend, Brandon Frazier, and Vanhook.[3]  Vanhook answered the door and asked Jimenez what he wanted.  Jimenez stated he wanted to purchase a "C note," referring to $100 worth of crack cocaine.  Vanhook turned to Sligh and said "Well, we can go half on that, . . ." (R. Vol. V at 58.)  Vanhook pulled a plastic baggy from his pocket and retrieved three rocks of crack cocaine.  Jimenez testified four or five rocks of crack cocaine remained in Vanhook's baggy, which he estimated weighed approximately one gram.  Sligh went to her bedroom and returned with three rocks of crack cocaine.  Sligh then provided all six rocks (the three rocks from Vanhook and her three

indictment.

[2] Jimenez had previously purchased drugs from Sligh.  Sligh's nickname was "Le Le."

[3] Sligh and her boyfriend shared her bedroom.  Vanhook, also known as "Quincy Walker" or "Q," slept on the couch in the living room.  Vanhook moved in with Sligh in July 2002 and lived there until the end of September 2002.

rocks), weighing 1.15 grams, to Jimenez.

The next day, Jimenez returned to Sligh's residence to purchase more crack cocaine. Sligh was not home. Vanhook agreed to sell Jimenez another $100 worth of crack cocaine. Vanhook removed some crack cocaine from a baggy and gave it to Jimenez. The crack cocaine provided to Jimenez weighed 1.27 grams. Jimenez testified three or four rocks of crack cocaine remained in the baggy and estimated their weight at less than a gram, "[p]robably about half a gram." (R. Vol. V at 63-64.)

On September 16, 2002, the Lea County Drug Task Force executed a search warrant at a home belonging to a Kena Wright. Weston Lauder, a drug dealer from California, was present at the time of the search. At the home, officers discovered nearly two pounds of powder and crack cocaine and approximately $15,000. During her interview with police, Wright identified the names of other drug dealers in the Hobbs area, including Vanhook and Sligh. The officers already knew where Vanhook and Sligh were living based on prior intelligence and were aware that the New Mexico State Police had been conducting undercover operations at their residence.

On September 17, 2002, Jimenez returned to Sligh's residence to purchase crack cocaine. Vanhook retrieved five rocks of crack cocaine, weighing .85

grams, from a baggy and sold them to Jimenez for $100.[4] Jimenez testified approximately five rocks of crack cocaine remained in the baggy, weighing "probably [] a little over a gram." (*Id.* at 67.)

Later that same day, Jimenez and other officers executed a search warrant at Sligh's residence. Officers discovered scales and a baggy containing white residue, later determined to be cocaine. The baggy was found in a second unfurnished bedroom among clothes laying in an open suitcase. Also in the suitcase was a bus ticket issued to "Quincy Walker." They also found two handguns (a Smith & Wesson .22 caliber revolver and a Bersa Thunder .380 caliber semi-automatic handgun) inside a dresser in Sligh's bedroom and a loaded handgun (a Makaraov 9 X 19 semi-automatic handgun) in the living room under the cushions of a loveseat sofa. All three weapons belonged to Sligh.

Vanhook and Sligh were eventually arrested. On July 1, 2003, Vanhook was charged in a second superseding indictment with (1) conspiracy to possess with intent to distribute five grams and more of a mixture and substance containing cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B) and 846 (Count I); (2) three counts of possession with intent to distribute less than five

---

[4] Forensic scientist Eric Young testified that the five rocks sold to Jimenez on September 17, 2002, were initially tested by a different chemist, Cheyenne Klein. She recorded their weight as .94 grams. When Young tested them, they weighed .85 grams. He stated the reason for the discrepancy was that in order to test the substance, Klein had to use a certain amount of it.

grams of a mixture and substance containing cocaine base (crack cocaine) in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Counts II-IV); (3) being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2) (Count V) and (4) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count VI).[5] Upon the government's motion, Count VI was dismissed prior to trial.

On July 29, 2003, trial began before the Honorable William F. Downes, who was visiting from the District of Wyoming. The next day, the jury returned a guilty verdict on all five counts. On December 4, 2003, the Honorable John Edwards Conway sentenced Vanhook to 120 months imprisonment, the mandatory minimum sentence for Count I.[6] *See* 21 U.S.C. § 841(b)(1)(B)(iii). This appeal followed. Vanhook's appeal challenges only his convictions on Counts I and V.

## II. Standard of Review

"We review de novo whether the prosecution presented sufficient evidence to support a conviction." *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002). "In conducting this review . . . we ask whether, taking the evidence--both

---

[5] Sligh was also charged with various drug and firearm offenses. She pled guilty pursuant to a plea agreement. *See infra* note 11.

[6] The district court imposed concurrent 120-month sentences on each count (Counts I-V). Based on an offense level of 28 and a criminal history category of IV, Vanhook's guideline range was 110-137 months. However, because Count I's mandatory minimum sentence was 120 months, the applicable guideline range became 120-137 months.

direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). We will not re-weigh the evidence or assess the credibility of witnesses. *Id.* Under this standard, "[w]e will not reverse a conviction . . . unless no rational trier of fact could have reached the disputed verdict*." United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (citations and quotations omitted). If we conclude the evidence presented was insufficient to sustain a conviction, retrial is prohibited. *Id.*

### III. Discussion

*A. Conspiracy Conviction*

Vanhook claims the evidence was insufficient to support the jury's verdict that he conspired to possess with intent to distribute *five grams and more* of crack cocaine and, as a result, the 120-month mandatory minimum sentence should not have been imposed. He contends the total amount of crack cocaine seized was 3.27 grams--the sum of crack cocaine sold to Jimenez. Although Jimenez testified concerning crack "residue" in Vanhook's baggy, Vanhook argues this "residue"

-6-

could not weigh 1.73 grams,[7] the amount necessary to reach the five grams required to support his conviction and 120-month sentence. He states Jimenez's testimony concerning the amount of this "residue" is entitled to no weight because (1) Jimenez stated he did not get a good look at it, (2) Jimenez's estimate concerning the residue's weight was a "guess," and (3) Jimenez admitted it is difficult to estimate the weight of crack cocaine by sight due to the air contained within it. Additionally, Vanhook argues Jimenez conceded the "residue" could have been smoked by Vanhook or sold to Jimenez in a subsequent transaction.

Vanhook also attacks the government's other source of establishing the amount of crack cocaine involved--Sligh's testimony. He alleges Sligh's testimony was unreliable and incredible based on her admission she was addicted to drugs,[8] her extensive criminal history,[9] her lying to police officers at the time of her arrest,[10] and

---

[7] In his brief, Vanhook states it is impossible the residue weighed 1.83 grams. Vanhook's math is inaccurate; the correct amount to reach five grams is 1.73 grams.

[8] Sligh testified she was addicted to powder cocaine. She also testified she had used methamphetamine, ecstasy, crack cocaine, LSD and mushrooms. She stated her drugs of choice were marijuana and cocaine. She admitted on the stand she was unable to recall any drug transaction with an undercover officer because she was "probably intoxicated with drugs." (R. Vol. V at 106.)

[9] From 1997 to 2000, Sligh was convicted of receiving stolen property, possession of a controlled substance, carrying a concealed weapon and possession of crack cocaine. She also had four convictions for possession of less than one ounce of marijuana.

[10] Sligh admitted that at the time of her arrest she told the officers she was "Monique Harris" because she was "scared" and did not want the officers to know she had a prior probation violation in California. (R. Vol. V at 122.)

her entering into a plea agreement with the government based on her cooperation.[11] He also points out that her testimony concerning the number of drug transactions she participated in with Vanhook was vague and contradictory. Notably, Sligh initially testified she "went halves"[12] with Vanhook on $100 sales "[n]ot very many[,] *[m]aybe 10 to 15 times*" (R. Vol. V at 108 (emphasis added)) but seconds later her testimony changed to "*[a]bout four times.*"[13] (*Id.* at 109 (emphasis added).) He further points to her testimony concerning the number of times she "went halves" with Vanhook on $50 sales ("*Maybe five. I don't remember.*") and $40 sales ("*About six times, five to six times.*"). (*Id.* at 110 (emphasis added).)

In response, the government contends that in a conspiracy, a defendant is accountable for that drug quantity which was within the scope of the agreement and

---

[11] Sligh pled guilty to three counts: (1) conspiracy to posses with intent to distribute five grams and more of a mixture and substance containing cocaine base (crack cocaine), (2) being a felon in possession of a firearm and (3) possession of a firearm in furtherance of a drug trafficking crime. Based on these charges, Sligh faced at least a fifteen year sentence. Pursuant to the plea agreement, Sligh agreed to tell the truth concerning not only this case but also in de-briefings concerning other individuals. In exchange, the government agreed to move for a downward departure for substantial assistance; whether to do so remained within the government's sole discretion. Ultimately, however, it was the judge who would determine whether the motion would be granted. The jury heard all of this information.

[12] The term "went halves" means Sligh and Vanhook both provided drugs to the purchaser and split the proceeds.

[13] Although the government was questioning Sligh concerning $100 sales when it initially asked her how many times she and Vanhook "went halves," it appears her statement "[n]ot very many[,] [m]aybe 10 to 15 times" was actually the number of times she and Vanhook split sales altogether, not just on $100 sales. (R. Vol. V at 108.)

reasonably foreseeable to him or her. It maintains the evidence at trial demonstrated Vanhook conspired with Sligh to possess with intent to distribute more than five grams of crack cocaine. It points to the three sales Vanhook made to Jimenez, which involved a total of 3.27 grams of crack cocaine, and Jimenez's testimony that after each sale, Vanhook retained crack cocaine in his possession. The government also asserts the evidence showed that Sligh purchased nine ounces of crack cocaine and nine ounces of powder cocaine from Weston Lauder,[14] prepared crack cocaine at her home, and sold crack cocaine "[a]ll day, until it was gone." (*Id.* at 106.) Additionally, Sligh testified that if either she or Vanhook was not home at the time someone came to purchase crack cocaine, the other one would sell it and if both of them were at home, they sometimes "went halves" on sales. Sligh testified that she estimated she split the proceeds with Vanhook four times on crack cocaine sales for $100 (each sale involving one gram of crack cocaine), five times on crack cocaine sales for $50 (each sale involving a half gram of crack cocaine) and five or six times on crack cocaine sales for $40 (each sale involving a third of a gram of crack cocaine). Based on these estimates, Sligh testified she and Vanhook "went halves" on sales totaling eight grams of crack cocaine. Based

_____

[14] We conclude the government cannot rely on Sligh's purchases from Lauder. Sligh testified she bought the nine ounces of crack cocaine and nine ounces of powder cocaine from Lauder in early 2002. She specifically testified Vanhook had nothing to do with that purchase. She also testified she went to California and purchased four and a half ounces of crack cocaine from Lauder. However, the government never established when this purchase occurred.

on the above, the government argues the evidence, viewed in the light most favorable to it, was sufficient to support the jury's verdict on Count I.

In order to establish a conspiracy, the government must prove "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Dozal*, 173 F.3d 787, 797 (10th Cir. 1999) (quotations omitted). Vanhook challenges only the second element, i.e. whether there was sufficient evidence demonstrating that he conspired to possess with intent to distribute *five grams and more* of crack cocaine. In other words, Vanhook does not contest there was an agreement between him and Sligh to possess with intent to distribute crack cocaine; his sole argument is that there was insufficient evidence demonstrating that the quantity involved was five grams and more of crack cocaine. We disagree.

The government presented testimony from two witnesses, Sligh and Officer Jimenez, concerning quantity. Whether viewed in isolation or collectively, these witnesses testified that the amount of crack cocaine involved in the conspiracy was five and more grams.

Sligh testified that she estimated she "went halves" with Vanhook on eight grams

of crack cocaine.[15]  She also testified she prepared crack cocaine at her home and would sell it "[a]ll day, until it was gone" and would sometimes give it to Vanhook. (R. Vol V at 106.)  Jimenez testified he bought 3.27 grams of crack cocaine from Vanhook and/or Sligh.  He also testified that each time he bought crack cocaine from Vanhook, crack cocaine remained in Vanhook's baggy.  Although Vanhook attempts to characterize this remaining crack cocaine as "residue," Jimenez testified that "rocks" of crack cocaine remained.  (*Id.* at 63-64, 66.)  He estimated that after each of the three sales, the remaining crack cocaine weighed about one gram, a half a gram and more than one gram, respectively, for a total of approximately 2.5 grams.  When added to the 3.27 grams sold to Jimenez, the total amount of crack cocaine witnessed by Jimenez was 5.77 grams.

Although Vanhook challenges Sligh's and Jimenez's testimony on several grounds, all of these arguments were presented to the jury and apparently rejected.[16] Vanhook is essentially asking us to re-weigh Sligh's credibility and re-assess the

---

[15] Specifically, Sligh testified she and Vanhook "went halves" ten to fifteen times. She stated she went halves with him about four times on a $100 sale for a total of approximately four grams, five times on a $50 sale for a total of approximately 2.5 grams and five times on a $40 sale for a total of approximately 1.5 grams.

[16] Notably, the district court provided the following instruction to the jury:

Soleil Sligh has testified that she has abused drugs.  The testimony of a drug abuser must be examined and weighed by the jury with greater care than the testimony of a witness who does not abuse drugs.

(R. Vol. VI at 235.)

weight to be given Jimenez's testimony. This we cannot do. *See Avery*, 295 F.3d at 1177 ("During [our] review [of an insufficiency of the evidence claim], we will not assess witness credibility or re-weigh the evidence presented to the jury."); *United States v. Youngpeter*, 986 F.2d 349, 352-53 (10th Cir. 1993) ("[I]t is for the jury to decide which witnesses to believe and which not. Once the jury has spoken, this court may not reweigh the credibility of the witnesses."); *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) ("[We must] accept the jury's resolution of the evidence as long as it is within the bounds of reason.").

Based on the above, there was sufficient evidence presented to the jury to support its verdict on Count I and, consequently, the district court's imposition of a 120-month sentence.[17]

*B. Felon in Possession Conviction*

Vanhook also claims the evidence was insufficient to support his felon in possession of a firearm conviction. Because there was no evidence Vanhook actually

---

[17] Although acknowledging that his 120-month sentence falls within the statutory maximum for conspiracy to possess with intent to distribute five grams and more of crack cocaine, Vanhook argues *Apprendi* principles require the facts which trigger the application of a statutory minimum be determined by a jury beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466 (2000). The government argues *Apprendi* does not apply because the district court sentenced him based on the jury's verdict. The government is correct. The sentencing judge made no findings concerning Vanhook's sentence and Vanhook admitted so at oral argument. The sentence Vanhook received was based entirely on the jury's verdict, which specifically found him guilty of conspiracy to possess with intent to distribute *five grams and more* of crack cocaine. No Sixth Amendment violation occurred.

possessed any of the three firearms found at Sligh's residence, Vanhook contends the government had to show he constructively possessed one of the firearms. He contends the government failed to do so. He asserts the evidence at trial unambiguously demonstrated that the three firearms were found in Sligh's residence and belonged to her. He also points out that two of the firearms were hidden in a dresser in Sligh's bedroom where she slept with her boyfriend and the third was found hidden within a loveseat sofa in the living room, not the couch on which he slept. None of the firearms had his fingerprints on them and none of the evidence showed beyond a reasonable doubt that he knew of the hidden firearms or had access to them. Even assuming he exercised dominion or control over the living room where he slept, Vanhook contends such evidence is insufficient in a joint occupancy case. Additionally, although Sligh testified Vanhook "maybe, like one time" might have borrowed one of the guns, Vanhook asserts this evidence shows, at most, that he "maybe" borrowed one of the guns at some unspecified time. He states this testimony is too vague and ambiguous to support his conviction. (R. Vol. V at 104-05.)

The government contends it presented sufficient evidence demonstrating Vanhook constructively possessed at least one of the three weapons found in Sligh's home. The government argues Vanhook was aware of the guns in the home. It points to Sligh's testimony that although Vanhook "didn't really mess with the guns," Vanhook played with the guns and once took one of the guns out of the house. (R. Vol.

-13-

V at 104.) It also contends Vanhook had access to the guns because he lived in the house and slept in the same room where one of the guns was hidden.

To obtain a conviction under 18 U.S.C. § 922(g)(1) for possession of a firearm by a felon, the government has to prove beyond a reasonable doubt that (1) the defendant was convicted of a felony; (2) the defendant thereafter knowingly possessed a firearm; and (3) the possession was in or affecting interstate commerce. *United States v. Wilson*, 107 F.3d 774, 779 (10th Cir. 1997). Vanhook challenges only the second element.[18]

Proof of actual possession is not required to support a conviction under § 922(g)(1); constructive possession is sufficient. *Id.* In order for an individual to constructively possess property, he must knowingly have the power to exercise dominion or control over it." *United States v. Lopez*, 372 F.3d 1212 (10th Cir. 2004).[19] Constructive possession may be shown by circumstantial evidence but the government must show that there was a sufficient nexus between the accused and the contraband. *Id.* at 882. Constructive possession need not be exclusive and may be joint among

[18] Vanhook and the government entered into a stipulation that Vanhook had a prior felony conviction and that the three firearms discovered in Sligh's home traveled at some time from one state to another, thereby affecting interstate commerce. This stipulation was read to the jury.

[19] Both Vanhook and the government misstate the constructive possession rule as requiring that the defendant have ownership, dominion or control over the object *and* the premises where it is found. Control or dominion over the premises where the object is found is a factor, but not a requirement, for finding constructive possession. *See United States v. Lopez*, 372 F.3d 1207, 1213 (10th Cir. 2004).

several individuals. *Id.*; *United States v. Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982).

A defendant's exclusive control over the premises where contraband is found may support an inference of constructive possession. *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). However, "[i]n cases involving joint occupancy of a place where contraband is found, mere control or dominion over the place in which the contraband is found is not enough to establish constructive possession." *United States v. McKissick*, 204 F.3d 1282, 1291 (10th Cir. 2000). Rather, "the government is required to present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." *Id.* (quotations omitted). It must present "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the . . . contraband." *Id.* (quotations omitted).

The government's theory at trial was that Vanhook constructively possessed at least one of the firearms found in Sligh's residence. Because the firearms in this case were found in a home where three people resided, this is a joint occupancy case. Therefore, the mere fact Vanhook may have had control over the premises where the firearms were found is insufficient to establish his constructive possession of them. Consequently, the government was required to show, by direct or circumstantial evidence, some connection or nexus individually linking Vanhook to at least one of the

-15-

firearms.  The government asserts it did so by demonstrating at trial that Vanhook had

knowledge of and access to the firearms.  We agree.

Count V of the second superseding indictment stated:

On or about [September 17, 2002], . . . [Vanhook], a person who had previously
been convicted of a crime punishable by imprisonment for a term exceeding one
year, did knowingly possess in and affecting commerce firearms; that is, a Makaraov
9 X19 semiautomatic handgun, . . . a Smith and Wesson .22 caliber revolver, . . .
and a Bersa Thunder .380 caliber semi-automatic handgun . . . .

(R. Vol. 1, Doc. Entry 55.)  Although it is undisputed that all three of these firearms

belonged to Sligh and none of the firearms bore Vanhook's fingerprints,[20] the evidence

at trial demonstrated Vanhook had access to them.  Detective Stan Durham of the

Hobbs Police Department testified concerning the layout of Sligh's home and stated

nothing prevented its occupants from accessing every room of the house, including

Sligh's bedroom.  In fact, the unfurnished bedroom in which the bus ticket issued to

"Quincy Walker" was found contained a closet linking it to Sligh's bedroom; all one

had to do to access Sligh's bedroom from the unfurnished bedroom was push aside the

clothes in the closet.  The jury could have reasonably inferred from this testimony that

although Vanhook slept on the living room couch, he kept his personal belongings in

the unfurnished bedroom and therefore could easily access Sligh's bedroom through the

closet.  Additionally, the evidence demonstrated Vanhook had access to the firearm

---

[20] Although all three firearms were submitted for fingerprint analysis, no
fingerprints were found.  New Mexico State Police Officer Michael Wilson testified it is
rare to recover fingerprints from a firearm.

hidden within the loveseat sofa in the living room because he slept there.

As to Vanhook's knowledge of the firearms, the government presented Sligh's testimony, which consisted in relevant part of the following:

Prosecutor:  Okay.  Did [Vanhook] ever borrow any of those three guns?

Sligh:  Maybe, like, one time.

The Court:  All right. Let me stop you there, ma'am.  You say "maybe" --

Sligh: Like, one time, he didn't really--he's not--he didn't really mess with the guns.  He would, like, play with the guns in the house.  And there was one time that he might have--he took it out.

The Court: And you remember this event?

Sligh: Yes.

The Court: All right. Go ahead.

Prosecutor: Was this--when he took the gun--when he took the gun out, was this in September of 2002?

Sligh: I'm not sure.

Prosecutor: Did [Vanhook] tell you why he wanted to borrow a gun one time?

Sligh: No, he didn't discuss, really, what he did on the outside, away from my house. . . .

(R. Vol. V at 104-05.)  A reasonable inference from this testimony is that Vanhook had knowledge of the firearms in the home, having played with them and taken one out on

one occasion.[21]

In addition to showing knowledge and access, the government presented sufficient evidence demonstrating Vanhook knowingly exercised dominion and control over at least one of the firearms named in the indictment. Sligh testified Vanhook played with the guns in the house. Although she was equivocal as to when he played with the guns, the testimony at trial demonstrated Sligh moved into her home in March 2002 and that Vanhook resided there from July 2002 until the end of September 2002. The jury could have reasonably inferred from this testimony that Vanhook played with Sligh's guns and that this occurred sometime while he was living with Sligh. Her testimony also shows he borrowed one of the firearms and took one out. Again, while Sligh's testimony does not specifically indicate when this occurred, a reasonable inference is that Vanhook borrowed one of her guns while he was living with Sligh.

Vanhook relies on *United States v. Mills*, 29 F.3d 545 (10th Cir. 1994), but that case is clearly distinguishable. There, we reversed the defendant's felon in possession conviction based on insufficient evidence. *Id.* at 550. Although the government presented evidence that the defendant had dominion and control over the dining room

---

[21] The government also established through Sligh's testimony that drug dealers use guns to protect themselves. While this principle (that drugs and guns often go together), standing alone, does not allow a jury to infer a defendant's constructive possession of a weapon based on his or her possession of drugs, *see United States v. Hishaw*, 235 F.3d 565, 573 (10th Cir. 2000), it is reasonable to infer based on all of the evidence at trial that Vanhook, who was selling crack cocaine out of Sligh's home, had knowledge of and access to the firearms hidden within it.

where the firearms were found, it failed to establish the defendant knew the firearms were hidden within the compartment of the dining room table. *Id.* Here, Sligh's testimony established Vanhook not only had access to the firearms, but that he knew they were in the house.

As Vanhook argues, Sligh's testimony concerning Vanhook's connection with the guns was far from ideal. However, it is not our duty to re-weigh the evidence or Sligh's credibility. As demonstrated by the above analysis, there was sufficient evidence presented at trial, taken as a whole, supporting Vanhook's felon in possession conviction.

## IV.  Conclusion

We AFFIRM.

Entered by the Court:

**Terrence L. O'Brien**
United States Circuit Judge