**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LELAND DOYLE WOLLET,

    Defendant - Appellant.

No. 03-5113
(N. D. Oklahoma)
(D.Ct. Nos. 01-CV-540-H and
99-CR-158-H)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **HOLLOWAY**, and **TYMKOVICH**, Circuit Judges.

---

The events that bring this matter before us began when Leland Doyle

Wollet ("Wollet") moved in with his son, Brian Wollet ("Brian"), in Bartlesville,

Oklahoma, in December 1998.  At that time, Brian owned a computer and had an

account with America Online (AOL), an Internet service provider.  Because Brian

had an AOL account, he could navigate the Internet with as many as seven

different identities or screen names.  Father and son soon began to learn about the

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel.  The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Internet and navigation techniques. During the early part of 1999, Wollet, using Brian's account, assumed the screen name "OKMI1." In February 1999, because of various service problems, Brian cancelled his first account and opened a new AOL account which lasted until some time in March. When Brian created the new account, Wollet assumed the new screen names "MIOK" and/or "MIOK52."

When exploring the Internet, Wollet gravitated to chat rooms dealing with sex with young females, sex with family members and sex with animals. During Wollet's chat room visits, he stumbled on to users who repeatedly wrote "list me" in their chat room conversations. Wollet soon discovered that "list me" was Internet parlance chat room participants used to ask other participants to send them images or data. Wollet followed suit and began using the "list me" option. Consequently, he began receiving chat room-specific image files from other participants; *e.g.*, if he wrote "list me" in a chat room concerning sex with children, he would receive pornographic images of children having sex.

At some point, Brian discovered a bestiality image on his computer hard drive and confronted his father. His father responded something to the effect that "do you really think they check on this, do you really think they would know that we have this?" (R. Vol. V at 19.) Brian later discovered a depiction involving child pornography. Brian made clear to his father he did not want to see any more such images on his computer. He told his father if he didn't want to delete

-2-

Internet material, he should save it to a disk. Some time after February, Brian found disks stored in his father's briefcase next to the computer. He formatted the disks, believing he was erasing the material they contained.

During the course of one chat room visits, Wollet initiated a sexually explicit conversation with a person he believed to be a twelve-year-old girl, who was actually an officer with a federal Northeast Regional Child Exploitation Task Force. As the result of a grand jury subpoena to AOL, FBI Agents Keith Kohne and Matthew Moosbrugger confronted Brian, the individual on the account, concerning the identity of the OKMI1 screen name. Brian informed them the screen name belonged to his father and discussed the pornographic images he had observed earlier.

The following day, the same FBI agents approached Wollet, informed him of his *Miranda* rights and questioned him about the pornographic images associated with his AOL screen name. Soon after the interview began, Wollet brought the agents eighteen diskettes, admitting each had contained between six and twenty-five image files. Wollet also described how he obtained the images through chat rooms on AOL via the "list me" option and saved them to the diskettes. Wollet stated he labeled the diskettes according to the chat room from which he received the images. For example, the label "X" indicated that the disk contained pornographic images, "FAM" was indicative of images containing

family members having sex with one another, while "Y" indicated the images involved children engaged in sexual activity. Agent Kohne turned the disks over to Special Agent Joseph Cecchini who was able to retrieve many images thought to have been erased by formatting the disk.[1]

On November 3, 1999, a grand jury indicted Wollet for one count of possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). At trial in April of 2000, Agent Kohne testified to participating in numerous child exploitation cases and reviewing hundreds of child pornography images as part of his law enforcement duties. After testifying that he could identify whether a person was under age eighteen, he was asked by counsel to estimate the ages of the children depicted in the images introduced at trial. Agent Kohne identified and described over two dozen images of children engaged in sexually explicit activity retrieved from Wollet's diskettes. At the close of the government's case, the court denied Wollet's motion for judgment of acquittal under Rule 29 of the Federal Rules of Criminal Proceedure. On April 18, 2000, following a two-day trial, the jury found Wollet guilty of possession of child pornography.

On July 5, 2000, Wollet was sentenced to thirty months imprisonment and

---

[1] Since no new files were saved to the disks after being formatted, the data was not lost. Agents were able to retrieve the data files using commercially available software.

three years supervised release.[2]  During the sentencing hearing, Wollet was advised by the court of his right to appeal.  He, in turn, again asked his counsel if he could appeal.  Final judgment was entered on August 4, 2000.  The day before the notice of appeal was due, Wollet's counsel asked him if he wanted to appeal, although she again concluded there were no meritorious issues for appeal.  Wollet ultimately declined to appeal and, in fact, signed a waiver to that effect.[3]

On July 25, 2001, Wollet filed a motion to correct or vacate his sentence pursuant to 28 U.S.C. § 2255.  He later amended his motion to include a request that the court take judicial notice of the Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).  On May 28, 2003, the district court denied Wollet's § 2255 motion and denied a certificate of appealibilty (COA) pursuant to 28 U.S.C. § 2253(c).

We granted a COA to review whether trial counsel was ineffective by failing to: (1) argue, either in district court or on direct appeal, that the government did not meet its burden of proof on the federal jurisdictional element of the statute under which Wollet was charged and convicted; (2) argue, either in district court or on direct appeal, that the statute under which Wollet was charged

_____

[2]  Wollet completed his imprisonment term and is currently serving his term of supervised release.

[3] While the parties do not contest the existence of Wollett's waiver of appeal, it was not filed in the district court and has never been located.

-5-

was unconstitutional; and (3) perfect a direct appeal, despite the presence of several meritorious appellate claims and Wollett's clear desire to appeal his conviction and sentence. Reviewing Wollet's ineffective assistance of counsel claims *de novo*, *Brewer v. Reynolds*, 51 F.3d 1519, 1523 (10th Cir. 1995), we affirm.[4]

## DISCUSSION

To prevail, Wollet must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *See Strickland* v. *Washington*, 466 U.S. 668, 687 (1984). We "may address the performance and prejudice components in any order, but need not address both if [the defendant] fails to make a sufficient showing of one." *Cooks v. Ward*, 165 F.3d 1283, 1292-93 (10th Cir. 1998). Here, we confine our analysis to the prejudice prong, which requires Wollet to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

(A) Jurisdictional Element

Wollet claims his trial counsel was ineffective for failing to argue at trial or on direct appeal that the Government did not satisfy the jurisdictional requirement

---

[4] To the extent Wollet attempts to expand our review beyond the scope of our COA, specifically to encompass counsel's alleged lack of investigation and cross-examination, we decline to do so. 28 U.S.C. § 2253(c)(1)(A).

of 18 U.S.C. § 2252(a)(4)(B), which penalizes:

> **(a)** Any person who–
>
> > **(4)(B)** knowingly possesses 1 or more books, magazines, periodicals, films, video tapes, *or other matter* which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if -
> >
> > > **(I)** the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
> > >
> > > **(ii)** such visual depiction is of such conduct . . . .

(Emphasis added).

Wollet contends that his case is very similar to the situation in *United States v. Wilson*,182 F.3d 737 (10th Cir. 1999), and its progeny. *See United States v. Runyan*, 290 F.3d 223, 240 (5th Cir. 2002); *United States v. Henriques*, 234 F.3d 263 (5th Cir. 2000). In *Wilson*, we held that circumstantial evidence which linked a visual depiction on a computer diskette to interstate commerce could not also be used to similarly link two other diskettes. *Wilson,* 182 F.3d at 744. Thus, we held that to establish the jurisdictional nexus under Section 2252(a)(4)(B), the government must independently show that each visual depiction upon which a conviction is based had been transported in interstate or foreign commerce—in this case, via the Internet. *Id.* Our holding in *Wilson* was

aimed at limiting the government's ability to build its case on inferences, *e.g.*, by analogizing that since one image was downloaded from the Internet, other images must also have been downloaded from the Internet.

Here, however, the *Wilson* standard is altered in two important respects. First, we are confronted with a different § 2252(a)(4)(B) than was considered in *Wilson*. The government now only needs to prove that <u>one</u> rather than <u>three</u> visual depictions traveled in interstate commerce, obviating to an extent concerns that the Government could prove its case through inferences based on a link to only one visual depiction. 18 U.S.C. § 2252(a)(4)(B). Second, in this case we have detailed testimony confirming Wollett's admission he received the images over the Internet and copied them to the diskettes. Unlike in *Wilson*, where the expert witness "offered no explanation . . . as to how those particular images found their way to the diskettes in defendant's possession," here both Wollet's direct admissions and his son's testimony established the pictures on those diskettes were the same pictures received via the Internet. Although the official AOL records only contained information from January 1999, Wollet's admissions and his son's testimony confirmed Wollet's computer use in February, when the files were created. The evidence contains no inference that someone else gave Wollet the diskettes, nor that the pornographic images traveled any alternative path to his doorstep. The jury could rationally have concluded Wollet

-8-

downloaded the images from the Internet to the diskettes and thus, the images (the graphic files) traveled in interstate commerce.[5] *See United States v. Bass*, 411 F.3d 1198, 1202 (10th Cir. 2005); *United States v. Kimler*, 335 F.3d 1132, 1139 n.7 (10th Cir.) (geographical location of children depicted in images irrelevant; defendant's receipt of images over Internet established interstate commerce element), *cert. denied*, 540 U.S. 1083 (2003); *Wilson*, 182 F.3d at 744, n.4. As a result, the jurisdictional element was satisfied. Had Wollet's attorney raised this argument at trial or on appeal, the outcome of his case would not have been different.

(B) Unconstitutionality of statute

Next, we consider Wollet's claims that trial counsel was ineffective in failing to argue at trial or on direct appeal that the statute under which Wollet was charged was unconstitutional, for the same reasons the Supreme Court struck down 18 U.S.C. §§ 2256(8)(B) and (8)(D) in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (concerning the constitutionality of entirely virtual child

---

[5] Wollet's invocation of *United States v. Henriques*, 234 F.3d 263 (5th Cir. 2000), is equally unavailing. While we do not argue with the applicable standard, the fifth circuit was confronted with a situation far different from the one presented here. There, the government premised its entire case on the notion that because pornographic images were on the defendant's hard drive, and that computer was connected to the Internet, *somebody* had to use the Internet to put them there. *Henriques*, 234 F.3d at 266. The fifth circuit held this was insufficient to prove the defendant was criminally responsible for the images. *Id.* at 267.

pornography).  We find the argument wholly without merit.

In *Free Speech Coalition*, the Supreme Court considered the constitutionality of 18 U.S.C. § 2256(8)(B), and § 2256(8)(D).  Section 2256(8)(B) prohibited "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture" that "is, or appears to be, of a minor engaging in sexually explicit conduct."  *Free Speech Coalition*, 535 U.S. at 241, *quoting* 18 U.S.C. § 2256(8)(B).  "The section capture[d] a range of depictions, sometimes called 'virtual child pornography,' which include[d] computer-generated images, as well as images produced by more traditional means."  *Id*.  Section 2256(8)(D) defined child pornography as including, *inter alia*, any sexually explicit image that was "'advertised, promoted, presented, described, or distributed in such a manner that conveys the impression' it depicts 'a minor engaging in sexually explicit conduct.'"  *Free Speech Coalition*, 535 U.S. at 242, *quoting* 18 U.S.C. § 2256(8)(D).  The Court determined that § 2256(8)(B) prohibited materials that neither met the obscenity test under *Miller v. California*, 413 U.S. 15 (1973), nor qualified as child pornography, "which may be banned without regard to whether it depicts works of value," under *New York v. Ferber*, 458 U.S. 747, 761 (1982).  *Free Speech Coalition*, 535 U.S. at 249.  The Court further determined that Section 2256(8)(D)'s "conveys the impression" language could criminalize content that

was not child pornography, but merely appeared to be, thus exceeding the limits of *Ginzburg v. United States*, 383 U.S. 463 (1966) (allowing restrictions on the commercial exploitation of erotica when done solely for the sake of prurient appeal). *Free Speech Coalition*, 535 U.S. at 257-58. Consequently, the Court concluded these provisions were overbroad and an unconstitutional abridgement of speech.

Wollet was charged with violating 18 U.S.C. § 2252(a)(4)(B). Although the substantive provision pursuant to which Wollett was convicted, 18 U.S.C. § 2252(a)(4)(B), does refer to the definitions set forth in 18 U.S.C. § 2256, the two specific phrases deemed unconstitutional in *Free Speech Coalition* were not relevant to the issues at Wollet's trial. The jury instructions clearly required the jury to find beyond a reasonable doubt that Wollet "knowingly . . . possessed one or more matters containing visual depictions . . . [that] involved the use of a minor engaged in sexually explicit conduct; [t]hat such visual depictions were of minors engaged in sexually explicit conduct; and . . . [Wollet] knew . . . that at least one of the performers . . . was a minor engaged in sexually explicit conduct." (R. Vol. 1, Doc. 25 at 20.) Thus, there is no question the jury was instructed to find that an actual minor, not an "apparent" or "virtual" child, was the subject of the visual depictions Wollet possessed. The Supreme Court's ruling in *Free Speech Coalition* is inapplicable to a situation such as this, where

-11-

the allegations and evidence concern the interstate dissemination of pornographic images involving real children.[6] As a result, Wollet was not prejudiced by counsel's failure to raise this argument.

(C) Failure to Appeal

Last, we consider Wollet's claim that trial counsel was ineffective for failing to perfect a direct appeal, despite the presence of several appellate claims and Wollet's clear desire to appeal his conviction and sentence. We have long observed that a defendant's right to effective assistance of counsel applies not just at trial but also on direct appeal. *Abels v. Kaiser,* 913 F.2d 821, 822 (10th Cir. 1990); *see also Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). Moreover, we have held where a defendant claims that his counsel was ineffective for failing to perfect an appeal, he need only satisfy the first prong of the *Strickland* test—that counsel's performance fell below an objective standard of reasonableness. *Abels*, 913 F.2d at 823. In reviewing such claims, we "do not consider the merits of arguments

---

[6] It appears Wollet's entire *Free Speech Coalition* argument hinges on the government's repeated use of the word "appear" in its examination of the FBI agents at trial. The government's inquiry was focused solely on the ages of children contained in the depictions; its inquiry was not designed as an apocryphal way in which to examine whether the children depicted were somehow virtual in nature, as Wollet would lead us to believe.

that the defendant might have made on appeal." *Id.* Instead, "prejudice is presumed." *Hannon v. Maschner*, 845 F.2d 1553, 1558 (10th Cir. 1988).

Undoubtedly, counsel must explain the advantages and disadvantages of an appeal to his client. *United States v. Garrett*, 402 F.3d 1262, 1265 n.4 (10th Cir. 2005); *Baker v. Kaiser*, 929 F.2d 1495, 1499 (10th Cir. 1991). Wollet complains his trial counsel admitted she did not advise him of the option of filing a brief under the holding in *Anders v. California*, 386 U.S. 738 (1967). "However, if counsel reasonably believes that there are no meritorious grounds for an appeal, advises a defendant not to appeal on that basis, further advises him that he has a right to appeal regardless, and then acts in accordance with defendant's decision to waive an appeal, [counsel's] performance cannot be considered deficient." *United States v. Lopez*, 100 F.3d 113, 119 (10th Cir. 1996).

Wollet's own assertions reflect that every request he made to counsel to review the case was answered with both a commitment to investigate as well as a corresponding conclusion that there were no meritorious grounds for appeal. Nonetheless, counsel inquired if Wollet wanted to file an appeal, but he declined. He does not contend he instructed his attorney to appeal. He signed and filed a waiver of appeal. Thus, despite his claimed heartfelt desire to appeal, we cannot conclude his counsel's performance was deficient.

## CONCLUSION

For the foregoing reasons, the decision of the district court is **AFFIRMED**.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge
