**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RUPERT LENNON, JR.,

Defendant - Appellant.

No. 04-2059
(D. New Mexico)
(D.Ct. No. CR-03-1838 RB)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

Rupert Lennon, Jr., a commercial truck driver, was convicted by a jury of

possession with intent to distribute 100 kilograms and more of marijuana. He

appeals, arguing the Government presented insufficient evidence that he knew he

was transporting a controlled substance. Relying on *United States v. Booker*, --

U.S.--, 125 S.Ct. 738 (2005), he also contends his sentence should be vacated and

his case remanded for resentencing because he was sentenced under the

---

[*] This order and judgment is not binding precedent except under the doctrines of
law of the case, *res judicata* and collateral estoppel. The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

mandatory federal sentencing guideline scheme. Lennon further claims the judgment erroneously indicates he pled guilty. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm Lennon's conviction and sentence but remand this matter to the district court to correct the judgment.

## I. Background

Lennon has been a commercial truck driver since 1998. In 2002, he started his own business, Lennon & Sons Trucking, LLC, based in Tamarac, Florida. Lennon drives a refrigerated tractor-trailer rig and travels throughout the forty-eight states and Canada. Lennon obtains business from various brokers, who book his loads. When booking a load, he deals solely with the broker, not the customer.

On Monday morning, June 23, 2003, Lennon was in Phoenix, Arizona, when he received a call from a broker informing him that a load of mangoes needed to be picked up in Nogales, Arizona. Lennon agreed to haul the mangoes. At approximately 1:00 PM, Lennon arrived at Farmer's Best in Nogales, where 20 pallets containing a total of 3,840 boxes of mangoes were loaded into Lennon's truck. While Lennon did not participate in the loading, he did ensure that none of the boxes were damaged. The bill of lading states the mangoes were loaded at 1:20 PM, were to be maintained at a temperature of forty-eight degrees and were to be transported to Wakefern Food Corporation in Elizabeth, New Jersey.

Thereafter, Lennon drove north to a truck station in Rio Rico, Arizona, to weigh his truck. It took him approximately an hour to shift the weight in his truck to comply with the applicable state weight regulations. Lennon then drove to a TTT truck stop in Tucson, Arizona, arriving at approximately 5:00 PM. On the way to Tucson, he received a call from another broker who asked Lennon whether he could transport 3-4 pallets weighing over 1,000 pounds. Lennon informed the broker he could only transport 500-600 pounds because he was near the maximum allowable weight. The broker informed him he would talk to the customer to see if it would accommodate Lennon's weight restrictions.

Lennon waited at the truck stop for the broker's call. At about 9:00 PM, the broker called and informed Lennon the customer was willing to reduce the load. Lennon agreed to the transaction and the broker provided him with directions. Lennon got lost. Eventually, an individual met Lennon and led him to a loading dock.[1] Another man was waiting there with a forklift. This man, who Lennon testified was "definitely drunk" and "talking a lot of garbage," had nine boxes on a pallet. (R. Vol. III at 154, 181.) Pursuant to Lennon's direction, the man first removed two pallets of mangoes from Lennon's truck, added the pallet with the nine boxes and then replaced the two pallets of mangoes. Lennon testified he told the man to load the truck in this manner so the trailer's doors

_____

[1] The individual was driving a minivan with his two children in the backseat.

-3-

would support the boxes of mangoes, which were top heavy. The nine boxes were sealed together and labeled. The label indicated the boxes were being shipped by "AM Frozen Food Specialty, Inc." in Tucson to "Omega Produce Co., Lehigh Valley Produce Market" in Lehigh Valley, Pennsylvania. (Appellant's Addendum, Ex. 8.) According to the bill of lading, which Lennon signed, the boxes contained "fronzen [*sic*] exotic Japanese turtle tempura." (*Id.* at Ex. 12.) Although Lennon counted the boxes, he apparently did not open them, stating it was his practice and industry custom not to open his cargo.[2] He testified he was going to be paid $1,200 to transport the tempura. Lieutenant Charles Cox (Lt. Cox) with the New Mexico Department of Public Safety, Motor Transportation Division, and a former truck driver, testified this amount was "quite expensive." (R. Vol. III at 206.)

Once the nine boxes were loaded, Lennon locked the trailer, sealed its doors with a plastic seal[3] and drove back to the TTT truck stop in Tucson to weigh his truck. At approximately 10:30 PM, he left Tucson and drove into New Mexico. He arrived at a weigh station in Lordsburg, New Mexico, between 1-

---

[2] The bill of lading stated there were fifteen boxes of Japanese turtle tempura. Lennon amended it to reflect that there were only nine boxes.

[3] Lennon testified that a customer may request that a load be sealed. If the load is sealed, no one is allowed to enter the trailer. If the seal is broken when the load arrives at its destination, the driver "eat[s]" the load, *i.e.*, he has to find another customer to take the load. (R. Vol. III at 136.) Lennon further stated he usually seals his load to demonstrate to the customer that he is a responsible driver.

2:00 AM, where he slept. The next morning, he refueled, ate and completed his logbook for the previous day.[4] He did not fill it out accurately. The logbook shows Lennon was driving to Tucson when in fact he was weighing his truck in Rio Rico. It also fails to indicate he picked up the second load. Moreover, the logbook states he arrived in Las Cruces at 11:00 PM, when in fact he had left Tucson at 10:30 PM and arrived in Lordsburg between 1-2:00 AM.

After completing his logbook, Lennon began driving east until he arrived at an inspection checkpoint near Alamogordo, New Mexico. At the checkpoint, he was greeted by Agent Ricardo Sanchez, Jr., of the United States Border Patrol. During this initial encounter, Agent Sanchez asked him about his citizenship, what he was hauling, where he was coming from and where he was going. Lennon, who is a legal resident but not a United States citizen,[5] stated he was a United States citizen and was hauling mangoes from Nogales, Arizona, to New Jersey.[6] Lennon provided Agent Sanchez with the bill of lading for the mango load. Agent Sanchez testified Lennon "became increasingly nervous, kind of

_____

[4] Lt. Cox testified federal regulations required truck drivers to maintain a daily log. The daily log requires the driver to record when he is driving, when he is sleeping, when he is off duty, and when he is on duty, but not driving.

[5] Lennon is a citizen of Jamaica. He has been in the United States since 1987.

[6] Lennon testified he told Agent Sanchez he was not a United States citizen and would not have lied because he knew Agent Sanchez had the resources to verify this information.

-5-

shaking when he was handing me the [bill of lading], began to stutter a little bit and [] began speaking very rapidly."[7]  (*Id.* at 25.)  Agent Sanchez then asked Lennon if the load was locked or sealed; Lennon responded it was locked and sealed.  Agent Sanchez testified this raised his suspicions because in his experience, trucks hauling produce are normally not sealed.  The bill of lading did not indicate that the load was sealed.

Agent Sanchez then obtained Lennon's permission to search the truck and to perform a dog sniff on the vehicle.  The dog alerted to the rear of the trailer.  Agent Sanchez informed Lennon that agents would be inspecting the inside of the trailer and directed him to unlock the trailer.  Agent Sanchez testified Lennon appeared "puzzled and confused" but proceeded to unlock the trailer.  (*Id.* at 30.)  Agent Sanchez noticed Lennon's hand was shaking and "it took him awhile to get the key inside the lock to unlock it."  (*Id.* at 31.)  Lennon also broke the plastic seal with his hand, retained the seal and stepped back from the trailer.

Agent Sanchez immediately noticed the two pallets of mangoes.  He then observed several boxes wrapped in cellophane, which did not match the rest of the load, behind the mangoes.  Agent Sanchez, with the assistance of Agent Humberto Valeriano, inspected the boxes.  The boxes contained large bundles

---

[7] Lennon testified he used to stutter when he was young and attended speech therapy.  He stated he still stutters occasionally but has learned to control it.

wrapped in cellophane. The agents asked Lennon what the bundles were; Lennon stated he did not know. One of the bundles was opened and the substance inside field-tested positive for marijuana. The agents arrested Lennon.

Thereafter, Agents Sanchez, Valeriano and Hugo Gonzalez conducted a search of Lennon's truck. They found Lennon's logbook and the bill of lading for the second load. Sometime later, Agent Sanchez noticed that the plastic seal that had been removed from the trailer's doors was missing. Agent Gonzalez searched for the seal, discovering it on the other side of a barbed wire fence, approximately fifteen feet behind where Lennon had been standing during the search.[8]

A total of 361 pounds (147.38 kilograms) of marijuana was seized from Lennon's truck. Lt. Cox estimated its value at $360,000. Upon further investigation, agents learned the company to which the second load was addressed (Omega Produce) did not exist. They also discovered the address listed for the shipper (AM Frozen Food Speciality, Lehigh Valley Produce Market) actually belonged to Merit Foods, LLC, d/b/a Merit Marketing, LLC.

On September 17, 2003, Lennon was indicted for possession with intent to distribute 100 kilograms and more of marijuana in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. Lennon proceeded to trial. At trial,

---

[8] Lennon testified he did not throw the seal over the fence. He stated it fell from his hand but he did not want to bend down and pick it up out of fear of what the agents might think or do to him.

Lennon testified, essentially denying any knowledge that the nine boxes contained marijuana. The jury found Lennon guilty.[9] On March 9, 2004, Lennon was sentenced to seventy months imprisonment. This timely appeal followed.

## II. Discussion

On appeal, Lennon attacks both his conviction and sentence, arguing (1) the Government presented insufficient evidence at trial demonstrating he knew the nine boxes he was hauling contained marijuana, (2) he is entitled to resentencing because the district court sentenced him pursuant to the mandatory guideline scheme and (3) the judgment erroneously indicates he entered a plea of guilty. We address each argument in turn.

### A. Sufficiency of the Evidence

Lennon argues the Government presented insufficient evidence demonstrating he knew the second load contained a controlled substance. He asserts that in cases involving commercial truck drivers, courts have identified several factors that can support a plausible inference of knowledge, specifically: (1) whether the driver took an unusual or indirect route; (2) whether the truck or cargo emitted an odor either of drugs or a substance commonly used to mask the

---

[9] After the Government rested its case, Lennon moved for a judgment of acquittal, which the district court denied. After trial, Lennon renewed that motion and filed a motion for a new trial based on insufficiency of the evidence. The district court denied both motions in a written order.

odor of drugs; and (3) whether the driver made inconsistent statements concerning his destination or place of origin. Lennon contends no such evidence was presented in this case. Indeed, he contends he took the most direct, logical route from Tucson to New Jersey and did not avoid the checkpoint. Neither the trailer nor the nine boxes emitted any odor and he was honest and consistent with the agents concerning his point of origin and destination.

Lennon also argues the Government's evidence, whether considered separately or collectively, raised, at most, a mere suspicion of knowledge, which is insufficient. He alleges that although his logbook was inaccurate, the Government's own expert witness, Lt. Cox, testified truck drivers often fail to maintain accurate logs. He also claims Agent Sanchez's testimony that he lied to the agent concerning his citizenship does not demonstrate he knew about the marijuana. He states a legal resident, like himself, might well misinterpret a border patrol agent's question concerning whether one is a citizen as whether one is in the United States legally. Lennon further asserts that any nervousness he exhibited at having his truck searched is insignificant. He states it is common for an individual being confronted by three armed agents to exhibit signs of nervousness. He also points out that Agent Sanchez's testimony that he appeared "puzzled and confused" is consistent with the reaction an innocent truck driver would have under the same circumstances. Additionally, because none of the

agents knew him, Lennon asserts the agents could not know whether he was acting nervous or whether he was acting in his normal manner.

As to the presence of the plastic seal on the other side of the fence, Lennon argues the jury could not reasonably infer from the evidence that he threw it over the fence because he was in the presence of several agents and none of them saw him throw the seal over the fence. He also contends that because the marijuana was concealed from sight, the mere fact he was the owner and sole occupant of the truck is insufficient to establish his knowledge of the marijuana. Lastly, Lennon asserts the fact that the forklift driver who loaded the pallet of nine boxes onto his truck appeared inebriated does not show that he knew the boxes contained marijuana. He states the boxes were loaded without incident and the forklift driver's inebriation does not make it any more or less likely that the boxes contained marijuana.

"We review *de novo* whether the prosecution presented sufficient evidence to support a conviction." *United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002). "In conducting this review . . . we ask whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (quotations omitted). We will not evaluate witness credibility or re-weigh the evidence. *Id.* We will

-10-

only reverse a conviction if no rational trier of fact could have reached the disputed verdict. *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (citation and quotations omitted). Lennon's "divide and conquer"[10] argument is contrary. The jury properly considers all of the evidence and weighs its cumulative effect. Our review respects the jury's reasonable fact-finding.

The jury has the "discretion to resolve all conflicting testimony, weigh the evidence, and draw inferences from the basic facts to the ultimate facts." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). "However, we may not uphold a conviction obtained by piling inference upon inference." *Id.* "An inference is reasonable only if the conclusion flows from logical and probabilistic reasoning." *Id.* "The evidence supporting the conviction must be substantial and do more than raise a suspicion of guilt." *Id.*

"To establish a violation of 21 U.S.C. § 841(a)(1), the Government must prove [the defendant] (1) possessed a controlled substance; (2) knew [he]

---

[10] *Compare United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting "divide and conquer" approach to determining whether reasonable suspicion exists to perform investigatory stop of defendant's vehicle).

possessed a controlled substance; and (3) intended to distribute the controlled substance." *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002). The only contested issue at trial was whether Lennon knew the second load contained a controlled substance.[11] Like many cases where a defendant's mental state is at issue, the Government did not provide direct evidence of Lennon's knowledge, relying instead on circumstantial evidence. *United States v. Ortiz-Ortiz*, 57 F.3d 892, 895 (10th Cir. 1995) ("[A] criminal conviction may be sustained on wholly circumstantial evidence."). Nevertheless, the evidence, considered as a whole and in the light most favorable to the Government, was sufficient to prove Lennon knew he was transporting an illegal drug.

---

[11] The Government was not required to prove that Lennon knew he was transporting marijuana, only that he knew he was hauling a controlled substance. *See United States v. Gonzalez,* 700 F.2d 196, 200 (5th Cir. 1983) ("[T]he government is not required to prove that a defendant knew the exact nature of the substance with which he was dealing; it is sufficient that he was aware that he possessed some controlled substance."); *United States v. Jewell*, 532 F.2d 697, 698 (9th Cir. 1976) (en banc) ("The government is not required to prove that the defendant actually knew the exact nature of the substance with which he was dealing . . . . [A] defendant who has knowledge that he possesses a controlled substance may have the state of mind necessary for conviction even if he does not know which controlled substance he possesses."). Consistently, the jury was instructed that in order for Lennon to be guilty of possession with intent to distribute, it must find the Government proved beyond a reasonable doubt that (1) Lennon "knowingly possessed a controlled substance," (2) "the controlled substance was in fact marijuana," (3) Lennon "possessed the substance with intent to distribute it," and (4) the quantity of the substance was more than 100 kilograms." (R. Vol. I, Doc. 36, Instruction No. 12.) It was undisputed that marijuana was discovered in Lennon's tractor-trailer. Therefore, the main issue presented to the jury was whether Lennon knew he was hauling a controlled substance.

Lennon had sole possession of and control over the truck containing the marijuana. "[I]t is permissible to infer that the driver of a vehicle has knowledge of the contraband within it." *United States v. Cota-Meza*, 367 F.3d 1218, 1224 (10th Cir.), *cert. denied*, 125 S.Ct. 276 (2004). Lennon's logbook was inaccurate; in particular, he conveniently failed to indicate he picked up the second load. Although Lt. Cox testified that commercial truck drivers often "fudge" their logbooks (R. Vol. III at 101), it is difficult to understand how Lennon could fail to record such a significant event as the pick up of a load, especially when he completed the logbook the next morning. He also failed to provide Agent Sanchez the bill of lading for the second load. Further, Lennon directed the loading of the nine boxes in such a way that the boxes would be hidden from view if the trailer's doors were opened. From these facts, the jury could have reasonably inferred Lennon knew the second load was illegal, did not want any record of it and did not want anyone discovering it.

The jury also heard evidence that Lennon was paid over $1,200 for hauling nine boxes, sealed his truck even though it was uncommon to do so for perishable items and was hauling a frozen product with an unfrozen one.[12] These unusual circumstances support a reasonable inference that Lennon knew he was

---

[12] Lt. Cox testified it is uncommon for truck drivers to transport a frozen product with a product like mangoes, because mangoes get "mushy" if they are frozen and then thawed. (R. Vol. III at 205.)

transporting an illegal substance. Although Lennon alleges he did not know the second load was to remain frozen, the bill of lading indicated the product was frozen and it is logical to assume the product was to remain frozen.

Additionally, the jury heard evidence that Lennon had lied to Agent Sanchez concerning his citizenship, appeared nervous upon unlocking the trailer, "lost" the plastic seal, and was hauling over $360,000 worth of marijuana. Although most citizens display signs of nervousness when confronted by officers asking potentially incriminating questions, *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994), Lennon's nervousness, considered with the other evidence, could allow a reasonable jury to infer Lennon knew he was hauling a controlled substance and feared its discovery. The marijuana's value also supports an inference of knowledge as normally a person seeking to distribute drugs would not entrust such a large sum to just anyone. *See Cota-Meza*, 367 F.3d at 1224 ("This court has repeatedly recognized that the value of drugs can support an inference of knowledge.").

Considering the evidence as a whole, the Government presented sufficient evidence supporting the jury's verdict. While the evidence presented could have been consistent with either innocence or guilt, we have rejected the suggestion that we "should evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence." *United States*

-14-

*v. Hooks,* 780 F.2d 1526, 1531 (10th Cir. 1986). Moreover, although Lennon testified he did not know there was an illegal substance in his trailer, it was the jury's duty to weigh his credibility and the jury was not required to (and obviously did not) believe him.[13]

B. *Booker*

Relying on *Booker*, Lennon argues that because he was sentenced under the unconstitutionally mandatory federal sentencing guideline scheme, his sentence should be vacated and this matter should be remanded for resentencing. In *Booker*, the Supreme Court extended its holding in *Blakely*[14] to the federal sentencing guidelines, holding that the Sixth Amendment requires "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict [to] be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S.Ct. at 755-56. To remedy the constitutional infirmity of the guidelines, *Booker* invalidated their mandatory nature, requiring the district court

---

[13] Lennon relies on *State v. Pigford*, 892 So. 2d 724 (La. App.), *cert. granted*, 902 So. 2d 1034 (La. 2005). There, the Louisiana Court of Appeals held that the evidence was insufficient to show that a commercial truck driver constructively possessed a fifty-two pound package of marijuana that was concealed in the cargo of grapes the trucker was hauling. This case is not binding on us. Additionally, it is contrary to our case law. Under Louisiana law, in order for circumstantial evidence to be sufficient to convict, "it must exclude every reasonable hypothesis of innocence." *Id.* at 729.

[14] *See Blakely v. Washington*, 542 U.S. 296 (2004).

to consult them in an advisory fashion. *Id.* at 756-57 (severing and excising 18 U.S.C. §§ 3553(b)(1), 3742(e)).

Lennon did not raise either *Blakely* or *Booker* in the district court. Therefore, we review for plain error. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 730 (10th Cir. 2005) (en banc), *petition for cert. filed*, –- U.S.L.W.-- (U.S. Sept. 6, 2005) (No. 05-6407). To establish plain error, Lennon must demonstrate there is (1) error, (2) that is plain and (3) the error affects his substantial rights. *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005); *Gonzalez-Huerta*, 403 F.3d at 732. If these three prongs are met, we may exercise our discretion to correct the error if Lennon establishes "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings," *i.e.* the fourth prong of plain error review. *Dazey*, 403 F.3d at 1174. *See Gonzalez-Huerta*, 403 F.3d at 736-37.

In this case, no judicial fact-finding occurred at sentencing. At trial, the parties stipulated that "the net weight of the marijuana seized from the semi-truck [Lennon] was driving on June 24, 2003, when he was stopped at the U.S. Border Patrol checkpoint . . . was 100 kilograms and more . . . ." (R. Vol. III at 114; Appellant's Addendum, Ex. 21 at 1.) Additionally, the verdict form required the jury to determine whether Lennon was guilty of "possession with intent to distribute 100 kilograms and more of Marijuana . . . ." (R. Vol. I, Doc. 37.)

-16-

Because a base offense level of 26 applies to the possession with intent to distribute "[a]t least 100 KG but less than 400 KG of Mari[j]uana . . .," *see* USSG §2D1.1(c)(7) (2003), Lennon's sentence was based solely on the jury's verdict. Therefore, no Sixth Amendment violation occurred at sentencing. However, because Lennon was sentenced pursuant to the mandatory guidelines, we are presented with non-constitutional *Booker* error. *Gonzalez-Huerta*, 403 F.3d at 731-32 (holding "non-constitutional *Booker* error" occurs when the district court applies the guidelines in a mandatory rather than advisory fashion, even though the resulting sentence was calculated based solely upon facts admitted by the defendant or found by a jury).

Applying the plain error analysis, it is clear the first two prongs of the plain error standard have been met—there was error and the error was plain. *United States v. Clifton*, 406 F.3d 1173, 1181 (10th Cir. 2005) ("Non-constitutional and constitutional *Booker* errors satisfy the first two prongs of the plain-error test."). Moving to the third prong of plain error review, Lennon must show that the district court's erroneous mandatory application of the guidelines affected his substantial rights, that is, that it "affected the outcome of the district court proceedings." *Dazey*, 403 F.3d at 1175 (quotations omitted). However, we need not decide whether Lennon has satisfied the third prong of the plain error standard because, even if he has, we conclude he has not met the fourth prong.

-17-

*Gonzalez-Huerta*, 403 F.3d at 736.

"Under the fourth prong of plain-error review, a court may exercise its discretion to notice a forfeited error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* If "non-constitutional *Booker* error" is involved, as in this case, the standard for satisfying the fourth prong is "demanding"—the defendant must show that the error is "particularly egregious" and that our failure to notice it would result in a "miscarriage of justice." *Dazey*, 403 F.3d at 1178 (quotations omitted)*; Gonzalez-Huerta*, 403 F.3d at 736-37. We have recognized that in most cases involving "non-constitutional *Booker* error" the defendant will be unable to satisfy the fourth prong. *United States v. Trujillo-Terrazas*, 405 F.3d 814, 820-21 (10th Cir. 2005). This case is no exception.

Lennon received a sentence within the national norm as established by the guidelines and there is no evidence supporting a lower sentence. *See Gonzalez-Huerta*, 403 F.3d at 738-39 (considering in fourth prong analysis whether the defendant received a sentence within the guidelines/national norm and whether the record supported a lower sentence). Although Lennon was sentenced at the bottom of the guideline range, the only evidence potentially supporting a lower sentence was the fact that Lennon had young children. At sentencing, the district court heard from Lennon and several witnesses who expressed their concern over

-18-

the impact Lennon's absence would have on his children. In imposing sentence, the court stated:

> I heard what your teacher friend said when she spoke a moment ago. She sees this every day, and she sees families torn aport [sic] by bad decisions. And most of these decisions, it seems, . . . resolve [sic] around drugs. And what we see and what you know from where you are every day and what I know from where I am every day, is that the decisions of one are visited -- the consequences of those bad decisions are visited on the young. . . . And . . . this notion of the children having to endure a sentence that's imposed this morning, every bit as difficult as that which you must bear, is heartrending. I appreciate that, and I'm sorry for it, and I wish it weren't so.
>
> I've been asked to exercise clemency, to be as merciful as I can be. I, under these circumstances, don't have the discretion. We talked about the Sentencing Guidelines a little bit ago in another context. United States Congress has determined a range of sentences that I have to give. I'm going to sentence at the low end of that range, which is the discretion that I have, but I'm not in a position to do other than that in terms of the actual length of the sentence imposed.
>
> . . . .
>
> I'll be glad to make the recommendation that you be housed in Florida . . . . And I take no delight in what I have to do now.

(R. Vol. V at 7-8, 10.)

In *United States v. Nguyen*, we were confronted with similar comments by the district court. 413 F.3d 1170 (10th Cir. 2005). There, in imposing sentence, the judge noted the sentencing range was very high but stated the case was "governed by the federal guideline sentencing system, under which I have very

little discretion with respect to the sentence of imprisonment . . . . [T]he only leniency or mercy that I could impose would be to impose a sentence at the very bottom of the guideline range, which I will do." *Id.* at 1184 (emphasis in original omitted). On appeal, we stated that while such a statement suggested the judge was sympathetic toward the defendant, such "a general expression of 'leniency' or 'mercy' alone is insufficient to satisfy plain error under the fourth prong." *Id.* After distinguishing cases where the district court explicitly states it would impose a lower sentence if it had more discretion, we held the judge's statement was no more than "an acknowledgment of his desire to exercise discretion within a Guideline range generally appropriate for the crime committed; it is not a clear expression of a desire or willingness to depart downward." *Id.* We also noted that the judge's statement was not linked to any of the 18 U.S.C. § 3553(a) factors. *Id.* at 1184-85. Thus, there was no indication that the court would impose a lower sentence if it had the discretion to do so. *See also United States v. Sierra-Castillo*, 405 F.3d 932, 942 (10th Cir. 2005) (finding that comments of sympathy towards a defendant's circumstances do not in themselves demonstrate that "the sentence implicates the kind of fundamental fairness issues necessary to satisfy the fourth plain-error prong"); *Trujillo-Terrazas*, 405 F.3d at 821 ("Even if a defendant can demonstrate that the district court felt particular sympathy for him, and might impose a lesser sentence on remand, failing to correct [non-

constitutional *Booker* error] would not impugn the fairness, integrity, and public reputation of judicial proceedings. Indeed, a remand might do quite the opposite because another defendant convicted of an identical crime under identical circumstances could receive a different sentence from a less sympathetic judge.").

The same reasoning applies in this case. While the judge's comments suggest he was sympathetic to Lennon's predicament, there is nothing in the record to indicate he would have been inclined to impose a lower sentence, even had he realized he had the discretion to do so. Indeed, it appears the judge's comments were directed more toward Lennon's children than to Lennon himself.

Based on the above, Lennon fails to satisfy the fourth prong of plain error review; thus, we decline to exercise our discretion to correct the error.

C. Judgment Form

Lennon correctly states that the judgment erroneously indicates he entered a plea of guilty. This error is clerical in nature because it is clear the district court knew Lennon pled not guilty and proceeded to trial as the sentencing judge was the same judge who presided over Lennon's trial. Rule 36 of the Federal Rules of Criminal Procedure provides: "After giving any notice it considers appropriate, the court may at any time correct a clerical error in a judgment . . . ." While

Lennon could have moved to amend the judgment in the district court,[15] we will remand this matter for the limited purpose of allowing the judgment to be amended. *United States v. Morales*, 108 F.3d 1213, 1225 (10th Cir. 1997) ("Ordinarily, we . . . remand a case involving clerical mistake to the district court for correction.").

## III.  Conclusion

We AFFIRM Lennon's conviction and sentence but REMAND this matter to the district court to correct the judgment to reflect that Lennon pled not guilty and proceeded to trial.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

---

[15] The filing of this appeal did not divest the district court of jurisdiction to amend the judgment as Rule 36 permits such amendments "at any time." *United States v. Sasser*, 974 F.2d 1544, 1561-62 (10th Cir. 1992) (holding district court had jurisdiction to amend clerical error in judgment after the filing of the notice of appeal).