BRISCOE, Chief Judge,
dissenting:
I respectfully dissent. In my view, the evidence presented by the government at trial was sufficient to allow the jury to find that Dobbs knowingly received or attempted to receive the two images at issue (“14[2].jpg” and “b003 [l].jpg”), and that the two images were transported in interstate commerce. Thus, I would affirm Dobbs’ conviction and resulting sentence.

I. Standard of Review

Although the majority correctly recites the basic standard of review that applies to Dobbs’ sufficiency-of-evidence challenges, that standard bears repeating: “In reviewing sufficiency challenges, we ask whether, viewing the evidence in the light most favorable to the government as the prevailing party, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” United States v. Hutchinson, 573 F.3d 1011, 1033 (10th Cir.2009) (emphasis added). It also is useful to note an accompanying standard that we have long employed, but that the majority has overlooked: “The evidence necessary to support a verdict ‘need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.’ ” United States v. Wilson, 182 F.3d 737, 742 (10th Cir.1999) (quoting United States v. Parrish, 925 F.2d 1293, 1297 (10th Cir.1991) (citations omitted)). With those standards in mind, I now turn to the arguments asserted by Dobbs in his appeal.
II. Sufficiency of evidence— knowing receipt
Dobbs first contends that the evidence presented at trial was insufficient to allow the jury to reasonably find that he “knowingly” received or attempted to receive the two images at issue. In addressing this contention, I begin first with the statute of conviction, then proceed to address the evidence presented by the government at trial, and conclude by addressing the two specific arguments raised by Dobbs on appeal. Finally, following the discussion of Dobbs’ arguments, I shall outline what I see as the flaws in the majority opinion.
*1210 Dobbs’ conviction arose under 18 U.S.C. § 2252(a)(2), which provides that any person who
knowingly receives ... any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, if—
(A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(B) such visual depiction is of such conduct;
shall be punished as provided in subsection (b) of this section.
18 U.S.C. 2252(a)(2) (2006).
The statute does not define the terms “knowingly” or “receives,” “but in interpreting the[se] term[s], we are guided by [their] ordinary, everyday meaning.” See United States v. Tucker, 305 F.3d 1193, 1204 (10th Cir.2002). The district court instructed the jury that “[t]he term ‘knowingly,’ as used in the[ ] instructions, means that an act was done, or visual depictions were received, voluntarily and intentionally, and not because of mistake or accident.” ROA, Vol. I at 340. In turn, the district court instructed the jury that “[t]he term ‘receive’ means to accept an object and to have the ability to control it.” Id. These definitions, neither of which were challenged by the parties, comport with the terms’ natural, ordinary meanings. E.g. United States v. Bowling, 619 F.3d 1175, 1184 (10th Cir.2010) (affirming use of jury instructions that employed similar definition of “knowingly”); United States v. Stanley, 896 F.2d 450, 451 (10th Cir.1990) (approving of district court’s definition of “to receive” under § 2252(a)(2) as “to acquire control, in the sense of physical dominion or apparent legal power to dispose of the [object]”). Thus, I will employ these same definitions in analyzing whether Dobbs knowingly received or attempted to receive the two images at issue.
The government based its proof of Dobbs’ knowing receipt on the testimony of Jonathon Bridbord, a computer forensic specialist employed by the United States Department of Justice’s Child Exploitation and Obscenity section. Bridbord testified that his investigative task was to create and examine a “forensic bit-stream image,” or exact copy, of the contents of the hard drive of Dobbs’ computer in order to determine if any “child exploitation offenses” existed on the hard drive. ROA, Vol. 3 at 127-28. Before discussing his specific findings, Bridbord described for the jury, in general terms, what would have occurred each time Dobbs accessed the internet with his computer. According to Bridbord, when a computer user such as Dobbs utilizes Microsoft Windows Internet Explorer (the browser) to access a particular web site, the browser in turn directs the computer to contact the web site’s server (a dedicated computer holding the web site’s content). The server then transmits, and the user’s computer receives, the data and images associated with a particular page of the web site. In addition to displaying the images on the user’s computer monitor, the browser also creates a copy of each image on the page and deposits it into what is referred to as the temporary internet files folder (or cache). In other words, absent the presence of unusual circumstances, such as the occurrence of a pop-up or the existence of malicious software, an image cannot be simultaneously displayed on the computer monitor and copied into the cache without the user accessing a web site on which the image is contained. A computer utilizing a Windows-based operating system (such as Dobbs’ computer, which utilized the Windows XP Professional operating system) also creates an entry in what is referred to *1211 as the index.dat file, noting the date and time the web site was accessed. Lastly, if such a user employs a search engine, such as Google, to search for images or data, the user’s computer records each search term utilized, along with the date and time the term was utilized, into a file called the “Windows Registry.” Id. at 209.
According to Bridbord, Dobbs first began using his Windows-based computer on November 15, 2005. Id. at 255. Bridbord testified that he determined, based upon his review of the files on Dobbs’ computer, that Dobbs began performing Google searches for images of child pornography on December 15, 2005. Id. at 290. On that date, Bridbord testified, Dobbs used the search terms “ls-island,” “ww2.1s-island.net,” “www.ls-island.net,” “ls-magazine,” “ww2.1s-magazine/net,” and “ww2.1smagazine.net.” Id. at 211. According to Bridbord, the term “Is” is an abbreviation commonly understood in the law enforcement community as an abbreviation for “Lolita Studios,” and is associated with images of child pornography. Id. Bridbord testified that Dobbs continued to conduct searches for child pornography in late December 2005 (using the search phrase “very young sex”), February 2006 (using the search terms “young blowjob video,” “ls-island.info,” “lolita top,” and “lolita new”), early to mid-March 2006 (approximately March 5 through March 12) (using the search terms “pedo,” “erotic preteen,” “erotic pre-teen,” “pretty teen sex,” “youngest porn,” “young models,” “pre teen sex,” “priteen sex,” “priteen newsgroups,” “top preteen models,” “lolita models,” “pretene models,” “pedo,” and “pedo pics”), and early April 2006 (using the search terms “youngest cock sucker -gay,” “pedo sex,” “lolita blowjobs,” “youngest cock sucker,” “preteen models,” “young cock sucker,” “young blowjob bbs,” “preteen lolita,” “preteen newsgroups,” “lola,” “nymphet,” and “nymphet pics”). Id. at 291-93. In employing these search terms, Dobbs often advanced his browser numerous times in order to view additional search results (for example, Dobbs advanced his browser approximately thirty-six times when employing the term “preteen lolita”). ROA, Gov’t Exh. 1.4 at 32.
Bridbord also provided information about specific web sites visited by Dobbs. One of the exhibits prepared by Bridbord and admitted at trial, Government Exhibit 1.6, listed the web sites visited by Dobbs between November 15, 2005, the date Dobbs first began using his computer, and the time the computer was seized by law enforcement officials in April 2006. Those entries, based upon the index.dat file of Dobbs’ computer, indicated that Dobbs began visiting web sites that were potentially related to child pornography in late December 2005. ROA, Gov’t Exh. 1.6 at 1-2. Similar web site visits occurred in February 2006, id. at 3-5 (indicating a number of such web sites visited on February 10, 2006), March 2006, id. at 6, 9-10, 16-19, and April 2006, id. at 21-26, 28-29, 33-42. Notably, those visits were not always associated with Dobbs’ Google searches for child pornography images. In other words, the index.dat file entries indicated that, on some occasions, Dobbs directly visited potential child pornography web sites without first employing a search engine or any child pornography-related search terms.[1]
Bridbord proceeded to describe for the jury seventeen images of child pornography he found in the cache of Dobbs’ computer[2], including the two images that *1212 formed the basis of Dobbs’ conviction.[3] The first image at issue, which had a file name of “b003[l].jpg,” was created on March 15, 2006, at 9:29:56 p.m. The second image at issue, with a file name of “14[2].jpg,” was created approximately a minute-and-a-half later, at 9:31:17 p.m. on March 15, 2006. For these two image files to have been created in the cache of Dobbs’ computer, Bridbord testified, Dobbs “certainly ha[d] to visit a Web site or use another type of technology.” ROA, Vol. 3 at 301. Bridbord testified, however, that he was unable to identify, based upon his review of the index.dat file, the web sites from which the two images were derived. Id. at 302-03. Bridbord explained that there are occasions when “data doesn’t get written from the memory on to [sic] the hard drive,” id. at 297, as well as times when the “data gets overwritten and the data is gone,” id. at 272, thus forcing him “to piece together what’s there,” id. at 297. Bridbord ruled out the possibility that the two images at issue arrived in the cache of Dobbs’ computer by way of “pop-ups” or malicious software. Id. at 254, 255, 257, 264, 371. Bridbord also noted that, immediately following the creation of the two images at issue, Dobbs directly visited four web sites associated with child pornography and that, as a consequence of that action, eight additional images of child pornography were copied into the cache of his computer. In sum, Bridbord opined, based upon a combination of his experience and his analysis of Dobbs’ computer, that Dobbs’ receipt of the two images at issue was the result of him “methodically seeking out child pornography.” Id. at 222.
I readily conclude that Bridbord’s testimony and related exhibits were sufficient to allow the jury to find that Dobbs knowingly received the two images.[4] As noted, Bridbord’s analysis of Dobbs’ computer established that, from late December 2005 through April 2006, Dobbs methodically utilized Google searches to locate images of child pornography (employing various search terms and often advancing his browser numerous times to produce additional search results), and directly visited numerous web sites whose addresses strongly suggested an association with child pornography. Bridbord’s analysis further revealed that, as a result of this activity and the computer’s automatic caching process, multiple images of child pornography were copied into the cache of Dobbs’s computer, including the two images at issue. Considered together, I conclude that this evidence allowed the jury to find beyond a reasonable doubt that Dobbs knowingly sought and received the two images at issue by accessing web pages on which copies of those images were contained.[5] See United States v. Romm, 455 F.3d 990, 998 (9th Cir.2006) (“In the electronic context, a person can receive and *1213 possess child pornography without downloading it, if he or she seeks it out and exercises dominion and control over it”).
Dobbs raises two specific concerns, neither of which give me pause. First, Dobbs correctly notes that the government offered no direct proof that either of the two images actually appeared on his computer monitor. I am not persuaded, however, that such direct proof, which would be nearly impossible for the government to muster given the obviously secretive nature of the charged crime and the limitations of computer forensic science, was essential or, for that matter, required in order to support a conviction under 18 U.S.C. § 2252(a)(2). Given Dobbs’s pattern, both before and after the receipt of the two images at issue, of methodically searching for images of child pornography and visiting web sites with an association to child pornography, I conclude the jury could have reasonably inferred that Dobbs was similarly methodical in actually viewing any web sites that he accessed that might have contained such images.[6] In other words, I conclude the jury could have reasonably inferred that Dobbs would have, in his search for child pornography images, methodically scrolled down the entire length of each web page he accessed, including the pages that contained the two images at issue.[7]
The second concern raised by Dobbs is that the government offered no evidence from which the jury could infer that he knew about his computer’s cache or the caching process. Although this is true, I am not persuaded that such proof was required in order for the jury to convict Dobbs of knowing receipt of the images. As I see it, the government’s evidence established that Dobbs’s intent was to seek out and view images of child pornography. And this activity, which according to Bridbord afforded Dobbs temporary dominion and control over the images, was sufficient to establish his knowing receipt of the images. See Romm, 455 F.3d at 1000 (concluding that defendant “exercised control over the cached images while they were contemporaneously saved to his cache and displayed on his screen” because, “[a]t that moment,” he “could print the images, enlarge them, copy them, or email them to others”). Thus, it was irrelevant whether Dobbs was aware of the computer’s cache or the caching process, and the existence of copies of the images in the cache of his computer was, like fingerprints left at the scene of a crime, merely evidence of his actual criminal activity.
Having disposed of Dobbs’ arguments, it is necessary to outline what I view as *1214 significant flaws in the majority’s reasoning. Initially, the majority incorrectly suggests that the government’s case rested exclusively on “a pattern ... wherein the arrival of suspect images. on Mr. Dobbs’ computer was immediately preceded by searches using terms typically affiliated with child pornography.” Maj. Op. at 1202. Although Bridbord’s testimony and related exhibits established that Dobbs sometimes utilized this pattern, that same evidence established that Dobbs frequently visited child pornography web sites directly, i.e., without any preceding searches. Indeed, the evidence established that, within two minutes of the creation of the second image at issue in this case, Dobbs directly visited four child pornography web sites and received eight additional images of child pornography. Moreover, Bridbord testified that it is not unusual for persons interested in child pornography to learn about child pornography web sites through avenues other than search engines. As for his inability to identify precisely what web site(s) Dobbs visited in obtaining the two images at issue, Bridbord explained that there are occasions when “data doesn’t get written from the memory on to the hard drive,” ROA, Vol. 3 at 297, as well as times when the “data gets overwritten and the data is gone,” id. at 272. Finally, Bridbord ruled out the possibility that the two images arrived in Dobbs’ cache as the result of pop-ups or malicious software. In sum, the lack of evidence of any Google searches immediately preceding Dobbs’ receipt of the two images at issue is by no means fatal to the government’s case, because Bridbord’s testimony and related exhibits, taken as a whole, would have allowed the jury to reasonably conclude that Dobbs obtained the two images at issue by directly visiting child pornography web sites.
The majority also wrongly concludes that evidence of Dobbs’ frequent “pattern of [employing] child-pornography-related searches immediately preceding the creation of illegal images in the cache” of his computer “is irrelevant to the question of whether [he] knowingly received the two images that were properly before the jury.” Maj. Op. at 1204. Dobbs’ pattern of searching for and/or directly visiting child pornography web sites, which occurred both before and after the two images at issue were received on Dobbs’ computer, as well as his receipt of other images of child pornography, was highly relevant for purposes of proving both absence of mistake and knowledge. See Fed. R.Evid. 404(b) (“Evidence of other crimes, wrongs, or acts ... may ... be admissible for ... purposes [of proving] ... knowledge ... or absence of mistake or accident”).[8] As I have already outlined, it was precisely this pattern of methodical activity that would have allowed the jury to reasonably infer that, upon visiting a web site potentially related to child pornography, Dobbs would have methodically perused the entirety of the site in his search for images of child pornography, and thus would have knowingly received the two images at issue.[9]
*1215 In this same vein, the majority errs in concluding that, because there was no evidence that Dobbs knew of his computer’s automatic-caching function, “the presence of the child pornography files in the cache of Mr. Dobbs’ computer does not alone demonstrate — circumstantially or otherwise — his knowing receipt of those files.” Maj. Op. at 1205. Bridbord testified in detail about seventeen images of child pornography he found in the cache of Dobbs’ computer, including the two images at issue. With one exception, all of those images were copied into the cache at different times, thus indicating, according to Bridbord’s testimony, that on each of those occasions Dobbs visited separate web sites containing images of child pornography. ROA, Gov’t Exh. 1.12 at 1. Whether or not this evidence was sufficient, standing alone, to establish that Dobbs knowingly received the two images at issue, it was certainly relevant to that question. For example, this evidence would have supported a finding that the two images at issue arrived in the cache as a result of intentional activity on the part of Dobbs, rather than, as suggested by his counsel at trial, by forces beyond his control and unbeknownst to him, such as pop-ups or malicious software.
Relatedly, the majority errs in suggesting that Dobbs’ lack of knowledge of the automatic-caching process was fatal to his prosecution. The focus of Dobbs’ internet activity was obviously to find and view images of child pornography, not to create copies of those images in his computer’s cache. In turn, the knowing receipt issue hinged on whether Dobbs intentionally sought out and viewed the two images at issue. The fact that copies of the two images were found in his cache (along with other images of child pornography) was merely proof of that activity. In other words, Dobbs’ awareness of the cache or the automatic-caching process was unnecessary to his conviction.
Similarly, the majority wrongly asserts that, because the government presented no proof Dobbs was aware of the cache or the automatic-caching process, it “perforce failed to prove that [he] had the ability to control those images.” Maj. Op. at 1207. As Bridbord explained, however, images displayed on a computer user’s monitor can be manipulated, and thus controlled, by the user (for example by copying those images into a personal folder). ROA, Vol. 3 at 305, 354. Consequently, Dobbs’ crime was complete at the moment he viewed the images on his monitor because, at that moment, he necessarily had the ability to control the images, regardless of whether or not he exercised control. See Romm, 455 F.3d at 1000 (reaching similar conclusion).
Finally, the majority errs in concluding that the government’s evidence was insufficient to establish, for purposes of the attempt charge, that “Dobbs took a substantial step toward the knowing receipt of the two images at issue.” Maj. Op. at 1208. As with its analysis of the receipt charge, the majority wrongly refuses to acknowledge that it was entirely permissible for the jury to infer that Dobbs directly visited, with the intent of finding and viewing images of child pornography, web sites containing the two images at issue. More specifically, the jury could have based such a finding on the entirety of Dobbs’ internet activity, Bridbord’s expla *1216 nation for why he could not identify the web sites from which the two images at issue were derived, and Bridbord’s refutation of Dobbs’ theory that the two images may have resulted from pop-ups or malicious software. Such a finding by the jury, which I submit could have been the only reasonable finding it could have made based upon the government’s evidence, clearly would have satisfied the substantial step element of the attempt charge.
In sum, I conclude the evidence presented by the government at trial was sufficient to establish that Dobbs knowingly received, as well as attempted to receive, the two images at issue.
III. Sufficiency of evidence — travel in interstate commerce
Dobbs also contends that the evidence presented at trial was insufficient to establish the jurisdictional element for knowing receipt of child pornography under § 2252(a)(2), i.e., that the two images at issue traveled in interstate or foreign commerce. Indeed, Dobbs argues that we are bound by our prior decision in United States v. Wilson, 182 F.3d 737 (10th Cir.1999), to rule in his favor on this issue.
It is important to note that Wilson involved a different charge than the one at issue in the present case. In Wilson, the defendant was indicted for possessing three or more matters (one computer hard drive and ten computer diskettes) containing visual depictions of child pornography “which were produced using materials that had been mailed, shipped, or transmitted in interstate or foreign commerce in violation of 18 U.S.C. § 2252(a)(4)(B).” Id. at 740. At trial, a government witness testified that some of the images on the defendant’s computer diskettes originated in German magazines. Id. at 744. We concluded that “the fact that some of the images possessed by defendant originated at some point in German magazines does not demonstrate, without more, that the German magazines were actually ‘materials’ used to produce the images possessed by defendant.” Id. at 744 n. 5.
But the instant case is distinguishable from Wilson because the government in this case, unlike in Wilson, did not seek to prove that the materials used to produce the images traveled in interstate commerce. Rather, the government in this case sought to prove that the visual depictions had traveled in interstate commerce, relying on the statutory language that prohibits knowing receipt of “any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce .... ” § 2252(a)(2). This is a different jurisdictional prong than that relied on in Wilson.
Although Dobbs contends that the differences in statutory language are meaningless, I disagree. There is a significant difference between the materials used to produce visual depictions and the visual depictions themselves. They are independent jurisdictional prongs, either one of which the government must prove. See Wilson, 182 F.3d at 744 (“[T]he language of § 2252(a)(4)(B) makes it abundantly clear that either the visual depictions ... or the materials used to produce the visual depictions must have traveled in interstate commerce.”). Wilson focused on whether there was sufficient evidence to show that the materials used to produce the visual depictions had traveled in interstate commerce because the defendant in that case was charged under that jurisdictional prong. See id. at 740. Thus, Wilson does not answer the question presented under the jurisdictional prong in this case: whether proving the origin of photographs is sufficient evidence to prove that those visual depictions have traveled in interstate commerce.
*1217 The government in this case notes that it presented uncontroverted evidence that the two images at issue were originally created in Florida and New York, thus allowing the jury to reasonably find that, to end up on Dobbs’s computer in Oklahoma, the images necessarily had to have traveled in interstate commerce. Dobbs argues, in response, that the government’s theory is foreclosed by United States v. Schaefer, 501 F.3d 1197 (10th Cir.2007). In particular, Dobbs relies on the following language in Schaefer:
[E]ven if we assume arguendo that the images appearing in the foreign language movie clips and the image of the young girl originated outside of the State of Kansas (like the images from the German magazine in Wilson), the government offered no proof that the particular images on the CDs in question moved across state lines.
Id. at 1206.
I conclude that Dobbs’s reliance on Schaefer is misplaced. There was no evidence in Schaefer supporting where the images at issue there originated. Rather, the government’s only evidence was that the defendant had (a) used the internet, and (b) possessed CDs that contained images of child pornography. Id. at 1198. We declined to assume “that Internet use automatically equates with a movement across state lines.” Id. at 1205. Specifically, we held “that the government’s evidence concerning [the defendant’s] use of the Internet, standing alone, was insufficient to satisfy the jurisdictional requirements of these statutes.” Id. at 1207. Notably, we were not presented with a case where the government provided any other evidence of a jurisdictional nexus, such as evidence of the origin of an image. Moreover, we have since recognized that “Schaefer is limited to its facts — the government’s say so was not enough to prove that the Internet operates in interstate commerce, no matter how obvious.” United States v. Vigil, 523 F.3d 1258, 1266 (10th Cir.2008).
I thus address head-on whether evidence of the out-of-state origin of a photograph, as was presented by the government in this case regarding the two images at issue, is sufficient evidence to meet the jurisdictional requirement of § 2252(a)(2). Dobbs argues that evidence of the origin is insufficient for two reasons. First, the government did not prove an interstate internet connection. And second, even if the government proved where the original photograph was taken, this does not prove that the “particular” images found in Dobbs’s cache traveled in interstate commerce. See Aplt. Br. at 47.
I turn first to Dobbs’s argument that Schaefer requires the government to prove an interstate internet connection. As I have explained, Dobbs’s reliance on Schaefer is misplaced. In that case, we recognized that the government needed to prove that the images in question had moved between states, and proof of an internet connection, by itself was insufficient. See Schaefer, 501 F.3d at 1206. We noted that “the government offered no proof that [the defendant] accessed the images through an interstate Internet connection.” Id. That is not the same as requiring an interstate internet connection in every case in order to prove that an image has crossed state lines. While proof of an interstate internet connection may be sufficient to show that an image crossed state lines, it is not always necessary. Rather, the government must prove that the visual depictions traveled in interstate commerce at some point prior to arriving on Dobbs’s computer. See United States v. Snow, 82 F.3d 935, 941 (10th Cir.1996) (concluding that jurisdictional requirement that a firearm was “shipped or transported in interstate commerce” was met upon proof that “firearm had at some point crossed a state *1218 line.”); see also United States v. Urbano, 563 F.3d 1150, 1154 (10th Cir.2009) (recognizing sufficient jurisdictional nexus when firearm traveled in interstate commerce at some time in the past). An interstate internet connection is but one way to prove that the image traveled in interstate commerce.
I next address Dobbs’s argument that the government can prove only where the original photographs were taken, not where the “particular” images found on his computer came from. To answer this question, I must decide whether the statute distinguishes between original images and copies of those images when regulating visual depictions that have traveled in interstate commerce.
I begin with the statutory language, giving the words their ordinary or natural meaning. Wilson, 182 F.3d at 740. The effective statute refers to visual depictions that have been transported in interstate or foreign commerce “by any means including by computer.” § 2252(a)(2). As the government explains, when one computer sends a digital image to another computer, “the original image does not travel from the sender to the recipient. Rather, the original remains on the sender’s computer, and an exact digital copy is created on the recipient’s computer.” Aplee. Br. at 43. Thus, any transmission by computer necessarily involves the creation of copies.
Dobbs’s suggestion that the statute covers only “particular” images but not copies would render the statutory language “by any means including by computer” meaningless. But, federal courts “cannot construe a statute in a way that renders words or phrases meaningless, redundant, or superfluous.” United States v. Power Eng’g Co., 303 F.3d 1232, 1238 (10th Cir.2002). Because the statutory language explicitly includes “by computer,” and computers necessarily create digital copies when they transmit images, it follows that the statute covers copies of a visual depiction, and not merely the original visual depiction itself.
I am thus left to decide whether the evidence presented at trial was sufficient to prove that the two images submitted to the jury traveled in interstate commerce, “by any means including by computer.” Taking the evidence in the light most favorable to the government, I have little trouble concluding that a reasonable jury could find that an image originally created in New York or Florida necessarily had to have traveled in interstate or foreign commerce before arriving on a computer in Oklahoma. See United States v. Schene, 543 F.3d 627, 639 (10th Cir.2008) (holding that there was sufficient evidence to prove that a hard drive was a “material” that had traveled in interstate or foreign commerce upon proof that the hard drive was manufactured in Singapore); see also United States v. Williams, 403 F.3d 1188, 1195 (10th Cir.2005) (holding that there was sufficient evidence that a firearm had previously traveled in interstate commerce by proof that the firearm was manufactured out-of-state).
I note that this conclusion is supported by our prior unpublished decision in United States v. Swenson, 335 Fed.Appx. 751 (10th Cir.2009). In Swenson, the defendant was convicted for receipt, possession, and attempted distribution of child pornography under §§ 2252A(a)(2) and 2252A(a)(5)(B). Id. at 751. There, state agents in Wyoming discovered that the defendant was offering images of child pornography for download via Limewire, a peer-to-peer networking application. Id. At trial, the government introduced evidence that at least one image was being distributed out of South America. Id. at 753. We concluded that “[a] reasonable jury could (even if it need not) conclude from this evidence that, for the image to *1219 wend its way from South America to Wyoming, it had traveled in interstate or foreign commerce.... ” Id. While certainly not binding, the Swenson decision is persuasive regarding what a reasonable jury could conclude when given virtually the exact same evidence as that presented to the jury in the case at bar.
In sum, I conclude that because a reasonable jury could find that the two images at issue traveled in interstate commerce at some point before arriving on Dobbs’s computer, there was sufficient evidence to support the jurisdictional element.
I would affirm Dobbs’ conviction and sentence.

. According to Bridbord, it is not unusual for pedophiles to discover child pornography web sites through avenues other than search engines. ROA, Vol. 3 at 368.

. Bridbord testified that Dobbs’ browser was set to retain only a certain amount of data in the cache, thus resulting in the automatic deletion of older files. ROA, Vol. 3 at 368. *1212 Consequently, Bridbord testified, it was possible that additional images of child pornography were received by Dobbs on his computer, but were not recoverable after the computer was seized by law enforcement authorities. Id. at 368-69. Indeed, Bridbord testified, he was able to identify the existence of "a number of files that were overwritten that were picture files,'' but was unable to completely recover those files. Id. at 369.

. The district court ruled, at the conclusion of the government's evidence, that the government failed to present sufficient evidence to allow the jury to find an interstate nexus for the other fifteen images. That ruling has not been challenged in this appeal.

. Dobbs effectively concedes on appeal, as he did at trial, that he “received" the two images at issue. More specifically, Dobbs concedes: "1) that at various times he used his web browser to search for images of child pornography; (2) that he visited websites known to contain child pornography, and that some of these visits followed closely on the heels of his searches for child pornography; and 3) that images depicting child pornography were discovered on his computer.” Aplt. Br. at 22.

. I acknowledge that if a defendant accidentally views a pornographic image, "as through the occurrence of a ‘pop-up,’ " that image will be copied into the computer’s *1213 cache. United. States v. Romm, 455 F.3d 990, 1000 (9th Cir.2006). In light of the government's expert computer analysis in this case, however, I conclude the jury could have readily rejected the possibility that the two images at issue were accessed by Dobbs accidentally.

. The district court properly instructed the jury that it could base its findings upon either direct or circumstantial evidence, and could draw reasonable inferences from the evidence. ROA, Vol. I, Part 2 at 329.

. Even if I were to conclude the evidence presented at trial was insufficient to allow the jury to reasonably find that Dobbs actually viewed the two images on his computer monitor, I readily conclude that the evidence was more than sufficient to establish that Dobbs attempted to receive the two images at issue. More specifically, this evidence would have permitted the jury to reasonably find that (a) Dobbs intended to locate and receive images of child pornography, and (b) took a substantial step towards commission of that crime by intentionally accessing the web pages on which the two images at issue were contained. See generally United States v. Ramirez, 348 F.3d 1175, 1180 (10th Cir.2003).

. Much, if not all, of the evidence of Dobbs’ computer activity was inextricably intertwined with evidence of the charged offense, and thus would not have been subject to Rule 404(b) analysis. See generally United States v. Parker, 553 F.3d 1309, 1314 (10th Cir.2009) (noting that "intrinsic evidence,” which is not subject to Rule 404(b), "is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury”). Nonetheless, it is useful in this context to note that, as set forth in Rule 404(b), even extrinsic evidence of criminal activity can be relevant for proving absence of mistake and knowledge.

. Although the majority takes the government to task for not presenting any evidence "establishing that Mr. Dobbs ever saw the images,” Maj. Op. at 1207, the majority fails to *1215 acknowledge the secretive nature of Dobbs’ crime, and in turn fails to identify precisely what evidence it believes could or should have been presented. In any event, the majority also fails to explain why the jury could not reasonably have inferred, based upon the entirety of Bridbord’s testimony and related exhibits, that Dobbs actually viewed the two images at issue.